HAZLETON TRIPOD-BOILER CO. v. CITIZENS' ST. RY. CO.

(Circuit Court, W. D. Tennessee. January 17, 1896.)

CONTRACT OF SALE—PAROL EVIDENCE TO VARY—FRAUD.

An agreement was made by a boiler company to furnish certain boilers, yet to be made, to a corporation, "at cost." The cost, however, was figured by the selling agent, and inserted, as a specified sum, in a written contract of sale, which was signed by the purchasing company after being submitted to its president and board of directors, who were experienced business men. In a suit to enforce a mechanic's lien for the price, defendant claimed that the sum named in the contract was much more than the real cost. *Held*, that to avoid the written contract, under such circumstances, would require very formidable evidence of fraud in procuring the insertion in it of the sum named, especially as the word "cost" is of very indefinite meaning, as applied to the various elements of expense which might be considered as going into the production and delivery of the boilers.

This is a bill to enforce the mechanic's lien for the erection of boilers in the defendant's power house, the stipulated price being

$17,000. ' The defendant company sets up fraud in the execution of the written contract, and asks to have it set aside. It is willing to pay only the cost of the boilers, which it avers was the real agreement, and was much less than the stipulated sum. The fraud charged is that Holmes, the agent of the plaintiff company, induced the president and board of directors to sign the written contract by false representation that it had been approved by Billings, the substantial owner of the defendant company, with whom the previous negotiations were made. It is admitted by the plaintiff company that it was the agreement to charge only the cost of the boilers, but that the sum of $17,000 was figured as that cost, and inserted in the written contract with Billings' knowledge and consent. At the hearing the court, being dissatisfied with the inconclusive character of the proof as to the cost, and what should be included in the calculation, referred the cause to a master to take further proof and report the facts as to the actual cost of the boilers to the plaintiff. The master reported as follows:

Master's Report.

To the Honorable the Judges of said Court, Sitting in Equity, at Memphis, Tennessee: The undersigned respectfully reports that under a decree of said court made and entered of record on July 11, A. D. 1894, reciting that it was "material to inquire into and determine what was the actual cost to the plaintiff company of furnishing and erecting for the defendant company the three boilers referred to in the pleadings and evidence" in said cause, it was referred to the master "to take proof and report what was the cost to the plaintiff company of the boilers furnished to the defendant company; and inasmuch as the parties hereto are at variance on the question of the mode of constructing, the cost of furnishing and erecting, said boilers,—the plaintiff company contending that the same should be estimated on the basis of including therein all the costs, either direct, or indirect and incidental, embracing in the incidental and indirect cost a proper and just proportion of the general expense account of the plaintiff, and the defendant company contending that the same should be confined to the first and direct cost of manufacturing and erecting same,"—the master being by said decree specifically directed to "report the cost of said boilers upon each of said theories, itemizing in detail every element reported as entering into the cost under each theory." Since the entry of said decree of reference the complainant company has taken, and on November 17, 1894, filed, the deposition of G. W. Griffin, previously secretary, and now assignee, of said company, which made an assignment in December, 1892; and the defendant on October 16, 1894, filed the deposition of Henry Pratt. Griffin has charge of complainant's books, and with his deposition are filed, as exhibits, its accounts and bills, etc., accruing from the construction and erection of these boilers, the items of which all appear on the books. Exhibit 1 thereto shows the summary of all these accounts, as well as the "statement of expenses of conducting the business of the Hazleton Tripod-Boiler Co. for the year ending March 1, 1892." Complainant had no manufactory or plant for the manufacture of boilers. This deposition of Griffin, and the accounts, etc., filed with it, show that complainant actually expended, directly, in the construction and erection of these boilers, the following sums, viz.:

| | | |
|---|---|---|
| To draftsman for making plans of boilers | $ | 87 50 |
| For materials used in the construction | | 9,738 63 |
| For freight transporting boilers to Memphis, etc | | 870 06 |
| For expenses at Memphis in erecting boilers | | 1,100 75 |
| For traveling expenses, etc., of employés | | 560 80 |
| For salaries of four men so employed | | 737 50 |

Making as the direct, first cost or actual expense........ $13,095 24

Plaintiff claims there should be added to this first or direct cost a proper proportion of the general expense of conducting the business of the company, as an element in the entire cost of these boilers, and Mr. Griffin arrives at such proportion by charging $1500/4935$ of the year's expenses to the further cost of these boilers; the company having sold during that year 26 boilers, having an aggregate of 4,935 horse power, the three constructed for defendant having 1,500 horse power. These general expenses are tabulated in Exhibit 1 to said Griffin's deposition, as follows:

| | | |
|---|---|---:|
| 1. | Wages of employés, the sum of | $ 9,739 67 |
| 2. | Advertising expenses | 4,086 93 |
| 3. | Traveling | 3,467 01 |
| 4. | Commissions on sales | 2,592 50 |
| 5. | Expense account | 2,313 03 |
| 6. | Printing and stationery | 1,292 59 |
| 7. | Rent of office | 1,333 34 |
| 8. | Litigation expenses | 676 35 |
| 9. | Telegrams | 120 89 |
| | | $24,622 31 |

And from the foregoing sum the witness deducts the amount of the wages and traveling expenses embraced in the direct expense, $13,095.24, which leaves $24,124.61, or $4.88 per horse power, general expense on the engines sold that year.

On 1,500 horse power, at $4.88, this would be................ $ 7,320 00
Which added to the first or direct cost..................... 13,095 24

Make the plaintiff's full claim of all cost................ $20,415 24

But the proof does not show just what is included in "wages of employés," though, from all the proof, it is inferred that this sum embraces, not only the regular wages of the men actually employed in superintending the construction of and in erecting boilers, but also the salaries of the officers of the plaintiff company. The monthly salaries of the four men who superintended the construction and erection of these three boilers amounted to $737.50, or within a small fraction of 50 cents per horse power. At that rate per horse power, the like expenses to the company of such salaries on the remaining 23 boilers, of 3,435 horse power, would have

been ..................................................... $1,717 50
Which added to said sum on these three.................... 737 50

Shows the proportion to be the sum of.................... $2,455 00
—For the company's like monthly wages proper. This being deducted from this entire item of $9,739.67, "wages of employés," would leave as the sum of the official salaries embraced therein for the year the sum of $7,284.67, or $1.48 per horse power, and at this rate, on 1,500 horse power, would amount to the sum of $2.220. To which the master reports there should be added a proportion of these items:

| | | |
|---|---|---:|
| 5. | Expense account for the year | $2,313 03 |
| 6. | Printing and stationery | 1,292 59 |
| 7. | Office rent | 1,133 34 |
| 8. | Expense of telegrams | 120 87 |

In all the sum of.............................. $4,859 83
Or 98½ cents per horse power, and on 1,500 horse power..... $ 1,477 50

Or in all, as general expenses, the sum of.................... $ 3,697 50
Which, added to the first or direct cost..................... 13,095 24

Makes the cost of these boilers.......................... $16,792 74
—Reported by the master on the plaintiff's theory.

The items for advertising ($4,086.93), traveling expenses ($3,467.01), commissions on sales ($2,592.50), and an expense of litigation ($676.35), have not been included by the master in the foregoing computation, because, though the proof shows that the sum expended for advertising was so paid, as well

as about one-third that sum the preceding year and one-half the sum in 1890, yet the company went into the hands of an assignee in the fall of 1892, and the volume of business transacted by the company during the two preceding years is not shown, and there is nothing in this record to enable the master, from the proof, to compute what proportion, if any, ought properly to be embraced in the cost of these three boilers; and there having been proven no expense of litigation, or commissions or traveling expenses of salesmen, incurred in or about the sales of these boilers, such items are, of course, omitted, as forming no part of their expense.

The master, in qualification of the sums so reported above, computed according to the horse power of the boilers, likewise reports that the same is not strictly accurate, because the expense per horse power of constructing and erecting large boilers is manifestly less in proportion than in case of small ones, and Mr. Griffin, in his testimony, concedes this; but there are no data in the record by which this difference can be ascertained. The method of computation employed is, of course, unfavorable to defendant, because these three are the only boilers of 500 horse power sold by the complainant company during the year; the other 23 all being smaller, only three of them being above 300 horse power, and 13 of them being each 100 horse power or less. If the proof showed specifically that, during the time of the construction and erection of these boilers for the defendant, the plaintiff was engaged in no other business, a proper proportion of these general expenses might, perhaps, be more satisfactorily arrived at by charging of the general expense for the whole year that proportion to the expense of these boilers which the time employed in their construction and erection bears to the whole year. But it does not.

The master respectfully submits that there should be allowed to him, as compensation for his services upon this reference, the sum of twenty-five dollars.

Respectfully submitted,                    John B. Clough, Master, etc.
Memphis, Tennessee, December 5, 1894.

The report was filed December 10, 1894. To this report the defendant company excepted as follows:

Exceptions taken by the defendant, the Citizens' Street-Railway Company, to the report made herein by J. B. Clough, one of the masters of this court, to whom this case was referred by an order of this court made and entered on the 11th day of July, 1894:

First exception: For that the said master, in his said report, states that the first cost or actual expense of the boilers was the sum of $13,095.24, whereas the said master should have reported and stated that the proof failed to disclose what the first cost or actual expense of said boilers really was. It is admitted, or, if not admitted, it is established by all the proof, that the plaintiff did not manufacture said boilers, but had them manufactured by corporations and firms engaged in the general business of manufacturing and making boilers. It is equally true that the sum of $13,095.24 so reported by said master embraces a proportionate part of the expenses and the profits of said corporations and firms which actually made said boilers; hence the real first cost of said boilers is not shown anywhere in the report or record.

Second exception: For that the said master, in his said report, has stated that the sum of $3,697.50 is the proper proportion of the general expense of the plaintiff to be charged to these boilers, when said master should have reported that the proof fails to show what part or proportion of the general expenses of the plaintiff was really chargeable to said boilers on the theory of the case insisted upon by counsel for the plaintiff. The report of the master itself shows that said figures of $3,697.50 are not accurate, and are unfavorable to this defendant. It further shows that there are no data in the record by which any accurate estimate can be made of what proportion of the general expense account of plaintiff should be charged to said boilers. The only evidence offered by the plaintiff on this point is that in the second deposition of G. W. Griffin. He attempts to arrive at the proportion of the general expenses to be charged to these boilers by finding the total horse power made

and sold by the plaintiff during the year 1892, and then dividing the general expense by total horse power; yet he admits that these boilers were the largest ever made by the plaintiff, and that a large boiler can be made cheaper per horse power than a small one. No other method of arriving at the proportion of the general expenses to be charged to these boilers is suggested or offered by the plaintiff.        Turley & Wright, Attorneys for Defendant.

The exceptions were filed February 1, 1895.

Metcalf & Walker, for complainant.

Turley & Wright, for defendant.

HAMMOND, J. (after stating the facts as above).   The investigation before the master to ascertain the "cost" of the boilers, as shown by his report and the exceptions to it, convinces me that the right of the parties must be governed solely by the written contract.   That was my impression at the hearing, but because Holmes admitted that he was to furnish the boilers at cost, without profit, and the defense was that, by fraud, he had procured a written contract for more, it seemed desirable, before final determination, to definitely ascertain precisely what the cost had been, which the proof did not then disclose.   It seems, from the master's report, that it is quite impossible to fix this satisfactorily; and this in the very nature of the thing, unless we give a meaning to the word "cost" that is more restricted than the plaintiff is willing to concede was meant in the negotiations for the sale.   We are all familiar with the seemingly insuperable difficulty of ascertaining the cost, for example, of producing a pound of cotton or of making a yard of cloth; and perhaps no two persons engaged on the problem would agree on the prime elements of the calculation, as none of the parties, witnesses, or the master can agree on them in this case.   Even in the simpler application to mere bargain and sale of a thing already in existence, and not to be manufactured, the term is ambiguous, and so much so that it is not impossible that often it will be found to avoid the contract for incurable uncertainty, though I have not found it necessary to go into that subject.   Specific performance of such a contract was refused, because it would be to make a contract for the parties and then execute it, where it had been agreed that arbitrators should fix the cost, and they had failed by disagreement about it; and in another case where it was so agreed, and one of the parties died, a court of equity would not specifically perform it, because of the incompleteness and uncertainty, such a case not being analogous to a recovery of the price of goods upon a quantum valebat. Frye, Spec. Perf. 165.   In searching for the legislative meaning of the word "cost" in a customs act, Mr. Justice Washington said, "The term is certainly of an equivocal meaning"; and in argument illustrates by saying:

"The actual cost of a bale of goods purchased at Liverpool is composed of the price paid for it, or, in other words, the prime cost and charges, including commissions on the purchase, the packages, if any; and, if the goods were purchased at the manufactory, then it includes, not only the prime cost and all charges attending them to the place of exportation, but also the charges before mentioned, and perhaps many others." Goodwin v. U. S., 2 Wash. C. C. 493, Fed. Cas. No. 5,554.

He laments that a court is called on to interpret "expressions of such doubtful import, without a clue to ascertain, with precision what was the real intention."

It would be interesting to search the cases which have, under varying circumstances, defined the term; but none has been produced, and I have found none, which limits the meaning as the defendant does, nor expands it as the plaintiff does. Indeed, they seem quite short of any direct bearing on the word as used by these parties, respectively. It would be comparatively easy to measure or weigh the materials used in these boilers, count the price or value of it, keep account of the hours of labor, and its value or price, and find these two primary factors of the problem, and also quite easy to avoid all the rest by counting these and ordinary freight and charges as the only cost; but that is hardly fair to the plaintiff, and so far from merely cutting away its "profit," which was agreed to be surrendered, would probably entail a loss. Yet the master concedes the cost, ascertained as he does it, is not wholly fair to the defendant; and one might easily suggest other elements of calculation largely increasing the cost, which, for a problem in economics, might be counted. Hence it was eminently desirable that these parties should beforehand do just what the plaintiff contends they did,—settle exactly what this "cost" was to be. If the defendant company, eminent as it is known to be for its high business character and enterprise, did not revise Holmes' offer before signing it, and see that the sum demanded was not too large, I cannot see that it can call on a court of equity to make such a revision now, after they have had the boilers in use, and the only possible question is what shall be paid for them. It would take the strongest proof of fraud or mistake to induce a court to set aside a written contract signed by the parties, distinguished business men as they were, upon the charge of imposition and overreaching such as is made in this case. And there is no such proof here; Billings and Holmes, upon whose testimony, respectively, the case depends, quite evenly balancing each other in the scales with which we judicially weigh the evidence. Even on the theory of the defendant, that it has only to pay the "cost" of the boilers, Holmes' testimony that, before he prepared the contract for signature, he and Griffin calculated the cost to the plaintiff company at $17,200, finds corroboration in the finding of the master in one calculation he makes of the cost at $16,792.74. It is urged against this that Holmes and Griffin now calculate the cost to be something over $20,000, and demand that sum, if the case is to be settled on the basis of the cost, and not the contract. But this is only a thing of calculation, and in such an inquiry it is open to them, if we break away from the writing, to make the final sum as large as possible on any theory of cost they may adopt, or find a sensible pretext for suggesting to us. They testify that in one of their calculations they came to a few hundred dollars over $17,000, and, because a rival manufacturer offered the defendant a bid for $17,000, they put that offer in the written contract, which explains the restraint they felt in figuring

the cost at as low a sum as anyone else would do the work. But the plain answer to all this is that business men, like those composing this defendant company and acting for it, should have known what they were doing when they signed the paper; and, with such men dealing with him, it would require very formidable proof to set the contract aside for any overreaching of them by Holmes. They should not be allowed to save their own negligence in not looking closely after this contract by any charges of fraud against Holmes not apparent without much reliance on a too loose weighing of seemingly inconsequential circumstances like those of Mr. Billings' age, his trustfulness of Holmes, and friendly desire to help him. In Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213, the parties had a written contract, and the plaintiff, in his bill, alleged that one of the "unexpressed" terms was to a certain effect. The court said it was a matter of dispute between the parties,—one affirmed, the other denied,—and the burden of proof was on the plaintiff to establish it, as here it is on the defendant company, or Billings, which is the same thing in effect. But the court ruled that, all previous negotiations and understandings having resulted in the contract, it alone should govern; and although the proof was in favor of the defendant, as against the burden of the plaintiff, it was rejected as wholly inadmissible to vary the writing. When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous colloquium between the parties as would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected. De Witt v. Berry, 134 U. S. 306, 315, 10 Sup. Ct. 536. In another case, where the burden was on the plaintiff, and his own testimony on which the issue rested was "inconclusive," the court put the decision on the rule that in the absence of fraud, accident, or mistake, this rule of evidence is the same in equity as at law. Forsythe v. Kimball, 91 U. S. 291. Until the contract is reformed on some of these grounds by a court of equity, all previous verbal engagements are merged in the written agreement, for the very purpose of avoiding any controversy or question respecting them. Insurance Co. v. Mowry, 96 U. S. 544, 547. And so are all the cases. Van Ness v. Washington, 4 Pet. 234, 284; Potomac Steamboat Co. v. Upper Potomac Steamboat Co., 109 U. S. 672, 3 Sup. Ct. 445, and 4 Sup. Ct. 15; Culver v. Wilkinson, 145 U. S. 205, 12 Sup. Ct. 832; Seitz v. Machine Co., 141 U. S. 510, 12 Sup. Ct. 46; Johnson v. Railroad Co., 141 U. S. 602, 12 Sup. Ct. 124; Bailey v. Railroad Co., 17 Wall. 96; Oelricks v. Ford, 23 How. 49. Here the defendant company would avoid this rule by charging Holmes with fraudulently procuring the writing in the terms in which it is couched, but substantially the proof of it rests wholly upon Billings' testimony, and it is mainly a struggle between these two as to their recollection of the preceding occurrences. This does not

answer that burden which the above authorities put on him who alleges fraud as against the writing signed by parties who are not affected by any infirmity, or feebleness of capacity to take care of themselves in a transaction like this. Holmes really concedes quite all that Billings claims as to their understanding about the contract for boilers which were to be furnished at cost without profit, and the substantial controversy is whether the $17,000 written in the contract is more than that cost, and the struggle over this relapses into contentions as to what is the proper basis for the calculation. The master reports that it is quite impossible to calculate it with satisfactory precision, and no doubt that is true; but the general fact remains that, on a fairly reasonable theory, it may be figured out to the sum which was charged and written in the contract, and there is no sort of pretense that Holmes and Billings had any agreement as to the theory or method of ascertaining the cost, and the fact that another bidder figured out the same price for his boilers,—of a different construction, however,—leaves it reasonably sure that the value of the thing wanted was in that neighborhood.

Holmes, perhaps, is justly subject to some criticism as a witness; but, after all, taking into consideration the adverse criticism of Billings' evidence, I think it is not proved that Holmes committed any fraud on the defendant company, in procuring its signature to this contract. The basic fact for the charge is that Holmes wrote into the contract a sum very much larger than the cost of the boilers, and this is not proved at all, unless we strip the calculation to its least possible factors, and adopt a theory of lowest possible cost,—the bare price of material and labor, almost. But this is only a construction put by the defendant company on the word "cost," and there is no proof of a specific agreement that Holmes should work the cost down to a minimum like that, in Billings' interest. Billings, for reasons given in the proof, arising out of their anterior business and personal relations, seems to think Holmes an ingrate, if he did not do this, and possibly, for similar reasons, believed that Holmes would do it, and also that he should have come to him, and gone over the figures with him, before writing up the contract; but, Holmes not having unequivocally agreed to do so, it was not a fraud on Billings to disappoint his expectations, which are no doubt much more vivid now, after the fact, than pending the negotiations, during which he was really neglectful about having some more precise understanding than his own unexpressed conception of the meaning of the word "cost." In this state of the proof, I conclude to reject the testimony, for all purposes, except as it tends to prove the fraud alleged; and, being inconclusive as to that, it is useless as against the contract. The exceptions to the master's report will be overruled, and it will be confirmed, with the allowance claimed by him for making it. The plaintiff to have a decree on the basis of the sum stipulated in the written contract, with interest, subject to such credits as the defendant may be entitled to, if any, with a reference to the master to fix this amount, if the parties disagree about it. Defendant to pay the costs.