BLAKE v. PINE MOUNTAIN IRON & COAL CO. et al. SOUTHERN LAND-IMPROVEMENT CO. v. MERRIWETHER et al.
BLAKE v. MERRIWETHER et al.

(Circuit Court of Appeals, Sixth Circuit. June 22, 1896.)

Nos. 379, 380, 390.

1. FEDERAL COURT—ANCILLARY JURISDICTION.
A federal court which has possession of property by receivers, and is engaged in administering the trusts pertaining to it, must take jurisdiction of any claim by any one whose interests would be injuriously affected by the action of the court in dealing with the property and administering the trust.

2. SAME.
Whether such ancillary jurisdiction be involved by original bill, by cross bill, or by intervening petition, diversity of citizenship is not essential to its maintenance.

3. ADMINISTRATION OF TRUST—PLEADING.
In a suit for general administration of a trust by foreclosure of a mortgage, where the classification of liens and preferences takes place, particularly in the case of commercial mortgages of corporate property, which are essential instrumentalities of corporate enterprises, the usual strictness of pleading is not required of those who come in to assert their claims to the property, or for payment out of it.

4. CONTRACT—RESCISSION BY COURT.
The fact that a party has not performed his contract even according to its legal effect does not necessarily entitle the other party to rescission, if either or both have partly performed, and circumstances of embarrassment have thereby arisen which make it impracticable to restore the status quo.

5. SAME.
The fact that the parties may voluntarily abandon or rescind the contract, and successfully sue or defend at law for nonperformance, does not necessarily require a court of equity to rescind for nonperformance.

6. VENDOR'S LIEN—PRIORITIES—SUBROGATION.
Certain contracts and conveyances made in connection with the transfer by the P. Co. of its property to the I. Co. construed as showing that vendors' liens existing in favor of the previous owners of part of the property were not intended to be kept alive by subrogation in favor of the P. Co., which furnished money with which to pay them off to the I. Co., which assumed them, so as to take precedence of a deed of trust given by the I. Co. to rescue part of the purchase money due the P. Co., containing a general warranty.

7. VENDOR'S LIEN—IMPLICATION.
A vendor's lien is never implied against warranties in any case where the circumstances show that the existence of such a lien could not have been intended, and would be in antagonism to the manifest intention to clear the title of such impediments.

**8. CONTRACT TO CONVEY LAND—CONSTRUCTION.**

In the course of a certain transaction, one B. agreed to sell and convey to another "real estate of the fair market value of $100,000 in excess of incumbrances," it being agreed that the incumbrances on any one tract should not exceed one-half the fair market value as fixed and ascertained by appraisement, and that the aggregate of incumbrances "existing against the said property, or parts thereof," should not exceed $20,000. The property was to be pointed out, its value determined, titles examined, and conveyances made as soon as practicable. *Held*, that the instrument referred to titles and incumbrances as of the date of its execution, and that B. could not thereafter place additional mortgages on the property, so as to bring the whole amount of incumbrances up to the sum of $20,000.

Appeals from the Circuit Court of the United States for the District of Kentucky.

The Pine Mountain Iron & Coal Company and the Southern Land-Improvement Company are two Kentucky corporations that were engaged in the business of exploiting on a large scale the improvement of immense tracts of Kentucky mining lands. The Pine Mountain Company had been in the ownership of considerable tracts of land, upon which they had opened mines, had built a railroad to be used in their operation, established coke ovens, projected a town, in which lots had been sold and houses built, and in divers ways accumulated what was called a "plant," with many appliances for the prosecution of its business. On the 13th of June, 1891, by a memorandum agreement of that date, it sold to the improvement company the whole of this plant, including "all its real estate and personal property of every kind, bonds, bills, accounts, choses in action, lands, mines, houses, stocks, railways, franchises, equities, easements, and other kinds of property and interests of every name and nature," for the consideration of $1,050,000. This consideration was to be paid with $50,000 of paid-up stock of the improvement company, the assumption by that company of all the liabilities of the Pine Mountain Company, "as shown by its books, but not to exceed $100,000," and the balance by the debenture bonds of the improvement company, having five years to run, bearing 6 per cent. interest, payable semiannually, and "secured by a lien on the real estate hereby conveyed." In order to further secure the payment and hasten the redemption of the debenture bonds, a trust fund was created of all the notes, bonds, accounts, etc., transferred to the improvement company, and of all sums realized from the sale of any part of the real estate, and a scheme was devised to deposit the bonds with the Louisville Trust Company, to be held by that company for redemption according to a scheme which it is not necessary to particularly mention; and it was further agreed that if any installments of interest were not paid, or the covenants of the trust were not kept, the whole debt was to become due, and a foreclosure should take place at once. Time was given to the improvement company to look into the affairs of the other, and determine by July, 1891, whether it would abide by this agreement. By another contract of June 27, 1891, between the same companies, the previous contract was confirmed, ratified, and made more definite and explicit. By this contract the vendor company sold to the vendee company, to be conveyed by proper deeds, with the usual covenants of warranty, free and clear of all incumbrances and liens of every kind, all of its real estate, personal and mixed property, the lands being more particularly described by reference to the deeds of record. Then it is recited that the balance due by the Pine Mountain Company on account of the purchase of these lands is assumed by the improvement company as a part of the $100,000 agreed to be paid under the former contract by assuming the liabilities of that company. The sale also included all personal property sold to the schedule to be furnished. It constituted all the choses in action, etc., transferred to the improvement company a trust fund for the "redemption of the bonds" to be deposited with the trust company and held for such redemption; and there were stipulations for the investment of money for the subsequent development of the enterprise at so much per month, and an agreement on the part of the improvement company to pay the immediate maturing liabili-

ties of the Pine Mountain Company, and that the bonds should be executed and delivered within 60 days.

On the 6th of January, 1892, there was a further agreement modifying the original contract in certain particulars. First, the improvement company's capital stock was to be limited to $5,000,000, and none was to be sold for less than par. Fifty thousand dollars full-paid, nonassessable stock and $27,000 in money were to be paid to the Pine Mountain Company at the time of making the deed, on or before February 1st, following. The improvement company was authorized to mortgage the town property and the Moss farm, if necessary, for an amount not exceeding $100,000, "which shall be a first lien upon the property," the proceeds to pay off the $100,000 of indebtedness assumed by the improvement company; but the improvement company was to substitute for the diminution by this proposed mortgage of the security for the bonds a bona fide subscription list of its capital stock, amounting to $100,-000, the solvency of the subscribers to be approved by the Pine Mountain Company, which subscriptions were to mature concurrently, at least, with the mortgage, and to be returned to the improvement company when the mortgage was paid. There were other stipulations, which we do not deem it necessary to mention in detail, but all within a scheme to pay off the "assumed liabilities" by the use of stock subscriptions or notes indorsed by the directors. Then the debenture bonds to be issued were reduced in amount to only $500,000, for the security of which a deed of trust to the Louisville Trust Company was to be made upon the entire property; and, in lieu of the other $400,000 of bonds thus cut out of the scheme, the improvement company was to redeliver to the Pine Mountain Company all the unpaid bills, notes, bonds, stocks, accounts, and other choses in action, and also to give its obligation for $200,000 in money. It was then stipulated that all the money realized from the sale of the stock was to be paid upon a certain class of obligations of the Pine Mountain Company, and after that one-half of the sales to the liquidation of $200,000, and the other half to current expenses. After the note was satisfied three-fourths of the sales of stock were to go to improvement and current expenses, and "the remaining one-fourth to the Louisville Trust Company, to create a sinking fund to pay the bonds herein provided for," and the improvement company was released from its obligations to invest stated monthly amounts in the development of the property. The Pine Mountain Company was to have a director in the improvement company. On the 25th of January, 1892, there was a still further modification of these stipulations, whereby the $27,000 in money was not required to be paid, but three-fourths of the net proceeds of the sale of the stock were to be applied to the liquidation of that $27,000. The $200,000 note was to be secured by mortgage upon a certain apartment house in Minneapolis, Minn., and the solvent subscription list of $100,000 of the capital stock was to be deposited with the Pine Mountain Company to replace the mortgage authorized to be executed upon the Kentucky town property. Next comes an agreement of February 1, 1892, concurrently executed with a deed of that date from the Pine Mountain Company to the improvement company, and also a mortgage from the improvement company to the Louisville Trust Company, also a bill of sale of the personal property, and also an explanatory contract with reference to particular parcels of land. The deed is in the ordinary form of a deed of general warranty, conveying the real estate by metes and bounds, and other sufficient descriptions, reciting in the usual form that the $1,050,000 was paid and to be paid,—$550,000 in hand paid, the receipt of which was acknowledged, and $500,000 "in the first mortgage bonds of the said party of the second part, the payment of the said bonds being secured by a deed of trust of even date herewith." The concurrent contract recites the making of the deed, and its acknowledgment of the receipt of $550,000, and states that the contract is made to show how the $550,000 has been paid, and of setting out the contract between the parties. Fifty thousand dollars was paid by a certificate of full paid up capital stock, and $200,000 by the return to the Pine Mountain Company of all the stocks, bonds, accounts, choses in action, etc., which had been sold to the improvement company. It then recites the stipulations for the making of the optional mortgage on the town property and the Moss farm, the proposed deposit of a bona fide solvent subscription list, and directs how

the money arising from the proposed mortgage shall be applied, and contains other stipulations about the taking care of debts and their repayment, and a scheme for the payment of $27,000 and the $200,000 note by the sales of stock; and, after all these obligations have been paid, then 25 per cent. of the net proceeds of the sale of stock "shall be paid over to the trustee in the deed of trust of even date herewith to secure the payments of bonds provided for in the deed of trust." And then, current expenses being provided for, there is a release of monthly investments of stated sums in the improvement of the property; provision is made for the report of the sales of the real estate to the trust company, for the insertion of omitted lands or lots, the payment of the expenses of the deed of trust and preparing the bonds; and then comes a stipulation that if the improvement company can sell any of the lots to advantage, for the purpose of making improvements of the property, the Pine Mountain Company will consent to such sales, "provided the party of the first part does not think that the security of the payment of the bonds is thereby impaired"; and finally the execution of the $200,000 note, with a method for its payment, is set out; and thus the whole plan of paying the gross consideration is displayed. The bill of sale is in the ordinary form for personal property, and the other concurrent contract makes provision for the removal of certain adverse claims to a parcel of the land by instituting necessary litigation for that purpose.

The mortgage to the Louisville Trust Company is in the usual form, and conveys the Kentucky lands included in these contracts in trust to fully secure the payment of the bonds and coupons therein mentioned, at maturity or sooner, as provided, to the lawful holders thereof; these bonds being the debenture bonds of $500,000, as described theretofore. The property is conveyed "for the equal benefit of the holders of all said bonds, according to their holdings thereof," and the Louisville Trust Company, as trustee, is to hold the same "for the use and security of the various persons who own or hold, or who may be lawfully entitled to receive payment of, such bonds and coupons, equal, pro rata, and without preference of one or the other." The mortgage contains the usual covenants of general warranty. There is a stipulation that after the payment of certain obligations the improvement company is to pay to the Louisville Trust Company, as trustee, one-fourth of the net proceeds of the sales of its capital stock, and of sums realized from the sale of any parts of the real estate, to constitute a trust fund for the redemption of these bonds, whenever as much as $2,500 has been paid in, the bonds so paid to be canceled. And there is a stipulation that the Pine Mountain Company will join in the execution of the proposed optional mortgage of the town property, "which shall be a first lien upon the said property prior to the lien created by this trust," and then a provision that the whole bond issue may be declared matured if there shall be a delay or default of interest lasting six months. Next comes a contract of February 16, 1892, which recites that one Blake and his wife had conveyed to the Pine Mountain Company certain property in Minnesota, known as the "Central Park Terrace," with 18 dwelling houses and other improvements, for the consideration of $200,000, but subject to a mortgage of $80,000; and the remaining $120,000, after deducting the mortgage, and after deducting also $16,200 allowed by way of discount in the settlement, is taken in payment of the $200,000 note of the improvement company, and of the $27,000 in cash that it had agreed to pay to the Pine Mountain Company, leaving a balance due on the settlement of $90,-800, for which the improvement company executed its note to the Pine Mountain Company, without interest, payable July 1st. Former agreements are modified in relation to the application of the proceeds of sales of the capital stock, and an agreement made on the part of the Pine Mountain Company to renew certain notes, and to assist in every way to extend as much as possible the obligations which have been assumed by the improvement company; and it then provides for the application, under certain circumstances, of the proceeds of the sale of stock to the payment of the new note of $90,800, provides for monthly reports of the sale of the capital stock from the improvement company to the Pine Mountain Company, the payment of taxes on the Blake purchase, and extends the time for the printing and execution of the bonds. It provides for the delivery of the railroad to the improvement com-

pany. Preceding this last-named contract is one of the 29th of January, 1892, between John D. Blake, of Minneapolis, Minn., and the improvement company, from which it appears that the Terrace property above mentioned was to be conveyed to that company for the consideration of $100,000 in the full paid up capital stock of the improvement company, if, upon an examination of the properties, Blake should subsequently be satisfied to make the conveyance which it seems from the preceding contract that he did execute.

On the 4th day of May, after the foregoing contracts were made, the Pine Mountain Company, by a resolution of that date, distributed the $500,000 of debenture bonds secured by the mortgage to its stockholders, at the rate of $25 in bonds to each share of stock held by any stockholder. After this, on the 10th day of August, 1892, J. D. Blake and the Pine Mountain Company entered into a contract wherein it is recited that the Pine Mountain Company owns $50,000 of the stock of the improvement company; is also the holder of a note for $90,800; that the improvement company had executed $500,000 of bonds, with a deed of trust to the Louisville Trust Company to secure them, and the installment of interest, $15,000, due July 1, 1892, was unpaid; and that the improvement company was primarily liable for about $100,000 of the indebtedness of the Pine Mountain Company under previous contracts, which it had not the ready money to discharge. It is then agreed that the Pine Mountain Company shall transfer to Blake the $500,000 of stock; shall assign to him the $90,800 note, except that it was to remain on deposit with the Louisville Trust Company to abide the payment of the $500,000 of bonds; and when these bonds should have been fully paid, or otherwise satisfactorily adjusted between the bondholders and the improvement company, and the deed, of trust satisfied, then the note was to be delivered to Blake. This assignment was to be without recourse upon the Pine Mountain Company. Also the Pine Mountain Company was to surrender and assign to Blake all claims before referred to, outside of the bonded debt and the note for $90,800 which it held against the improvement company, or upon which it was liable as surety not to exceed $100,000; and the Pine Mountain Company agreed to discharge the said obligations, as far as they were then due, 30 days from date, and the remaining obligations within 30 days from their maturity; and after they had been paid and taken up they were to be delivered, with all necessary and proper indorsements, to Blake, without recourse upon the Pine Mountain Company, to be valid and binding against the improvement company; and Blake was to be fully empowered to collect, adjust, and secure the same upon his own account, it being understood that this indebtedness embraced all the claims, actual or contingent, held by the improvement company, except the bonded indebtedness, and the note for $90,800. The Pine Mountain Company agreed to indorse the commercial paper of the improvement company for $8,-000, and to renew the paper for six months, the proceeds to be used for prosecuting the business of the improvement company. And, in consideration of these covenants and agreements, Blake was to pay the sum of $13,000 in hand, and $2,000 within 10 days, in consideration of which the interest coupons due July 1, 1892, were to be held by the Louisville Trust Company as an evidence of the indebtedness for that amount from the improvement company to Blake, but were to be canceled in the hands of the trust company. Also Blake was to convey to the Pine Mountain Company real estate of the fair market value of $100,000 in excess of the incumbrances, situated within the state of Minnesota, and largely within or near the city of Minneapolis; incumbrances on any one tract not to exceed one-half the fair market value as fixed and ascertained by appraisement, and the aggregate of incumbrances "existing against the said property, or parts thereof, shall not exceed twenty thousand dollars." The property was to be pointed out, its value determined, titles examined, and conveyances made by good and sufficient warranty deeds as soon as practicable in the ordinary course of business. Imperfect titles were to be cured within 30 days, or other property conveyed as soon as titles could be examined and appraisement made; and, if within 30 days imperfect titles could not be cured, other real estate, in lieu of rejected, imperfect titles, were to be taken under appraisement. The parties were to proceed at once to Minneapolis, and upon arrival Blake was to furnish a list of the real estate, by lot, block, or subdivision, and each was to immediately appoint an appraiser.

The two were to appoint a third, and these appraisers were to fix the fair market value of the property, each tract separately, and make a report of it. From the list so valued the $100,000 in excess of incumbrances was to be conveyed as soon as titles could be examined after appraisement; and if, upon full settlement of the indebtedness of the Pine Mountain Company to the Louisville Trust Company, it should turn out that there was less than $100,000 of the debts to be paid, there was to be a reconveyance, according to the appraisement, of the surplus to Blake.

In the process of the execution of this contract there were disputes between the parties, and on the 25th day of October, 1892, Blake and the Pine Mountain Company entered into another contract, reciting that Blake was now ready to convey real estate appraised at the sum of $98,800, subject to incumbrances of $20,040; that Blake had tendered other lands of the value of $21,940, but that it required reappraisement, and that after the making of the agreement of August 10, 1892, Blake had executed a mortgage for $17,290, as a part of the $20,040 of incumbrances; that his right to do so was disputed; and that, notwithstanding these difficulties and disputes, the parties were desirous to perform as far as practicable the contract of August 10, 1892, leaving the residue to be afterwards performed; "therefore the Pine Mountain Company now assigns, transfers, and turns over to Blake," the receipt of which is acknowledged, 5,000 shares of the capital stock of the improvement company, and four notes for $5,000 each, which are described; also indorsed the note of the improvement company for $6,000, and Blake thereupon delivered deeds of the real estate mentioned above, at the appraised value of $98,100, subject, however, to the right of the Pine Mountain Company to contest the right of Blake to impose the mortgage of $17,290. The Pine Mountain Company agreed to convey the whole of the lots thus conveyed to the Germania Safety-Vault & Trust Company of Louisville, Ky., as trustee, which was to sell the same and apply the proceeds to the taking up of the obligations of the improvement company; that under the contract of August 10, 1892, the Pine Mountain Company had agreed to assign these to Blake, and generally secure Blake in the full performance by the Pine Mountain Company of its obligations and covenants under that contract, and the obligations, as soon as taken up, were to be turned over to Blake, and properly assigned to him, according to the contract of August 10, 1892. But it was distinctly understood that the Pine Mountain Company reserved the right to insist that the Blake mortgage was wrongfully imposed, and Blake consented to enter his appearance "in an action" to be brought in the Louisville chancery court to test that question, subject to the right of removal to the federal court. Blake was to pay interest on the mortgage existing against the property to a certain date, but was to reduce part of the mortgage, and was to arrange that the Pine Mountain Company should be entitled to pay off the mortgage and its interest at certain periods, if it chose to do so. On the 7th of November, 1892, the Pine Mountain Company conveyed to the Germania Company, in trust, all these Blake lands, including the Terrace property and all other assets, which deed of trust recites a resolution of the Pine Mountain Company declaring the trusts upon which it was to be held, which were to collect or sell all assets and adjust all claims against the company, in order to convert the property and assets into cash in the most speedy and satisfactory manner: First, to pay all costs and expenses; second, to pay all advances made, with interest thereon as may be agreed upon; third, to pay all the debts and liabilities of the Pine Mountain Company; and, fourth, to distribute the balance among the stockholders. And then the deed of trust itself directs substantially that the trustee shall sell and apply the proceeds in accordance with this resolution, but, after directing the payment of the costs and expenses and the advances to be made by the trustee, it does also direct that the trustee shall pay the obligations mentioned in the contract made August 10, 1892, between the Pine Mountain Company and Blake, in which the Pine Mountain Company agrees to surrender and assign to Blake, and generally to secure Blake in the full performance of that contract. Concurrently with this deed of trust there was another conveying some 49 lots in Pineville, Ky., to the same trust company, for the same purposes, except that no mention is made of any obligations to be secured to Blake.

On the 4th of November, 1893, Blake filed his bill in the circuit court of the United States for the district of Kentucky against the Pine Mountain Company and the Germania Trust Company for a rescission of his contract with the Pine Mountain Company. He states that he was a large owner of the capital stock of the improvement company when he entered into the contract of August 10, 1892, and became a still larger holder afterwards. He then sets up, by way of averment, the contracts above mentioned, and avers that he paid and performed his part of the contract in relation to the cash payments for the $15,000 interest coupons, and appointment of the appraisers and their appraisement, and that he tendered and subsequently conveyed all the property in compliance with the contract, especially as to all incumbrances, these exceeding the exact sum of $20,000 by only $40, which he offered to pay; $98,100 of the lands were located within the city of Minneapolis, and $21,900 outside; and that $17,940 of the incumbrances were placed upon the property after the making of the contract of August 10, 1892. He then avers that the Pine Mountain Company at first refused to accept the conveyance, making objection to the form of appraisement, and objecting to the mortgage Blake had put upon the property after the contract of August 10, 1892, and after the appraisement, and insisting that Blake should cause to be released that mortgage, with which demand he refused to comply; also that the Pine Mountain Company refused to take the lands outside the city of Minneapolis. He recites the various efforts he made to induce the Pine Mountain Company to comply with the contract, and, failing in this, that they made the new contract of October 25, 1892. He then avers the performance of his part of that contract in all particulars, except the $40 excess, which he was at all times willing to pay, but that it still refused to recognize his right to make that mortgage, and that it also refused to unite with him for a reappraisement of the country property outside the city of Minneapolis, and to accept the conveyance of those lands for $21,940, insisting that it was Blake's duty to make up the lands from property in the city of Minneapolis, and to remove the $17,290 mortgage. He exhibits his written demands for the performance by the Pine Mountain Company in all respects. He then alleges that the trust deed to the Germania Trust Company was in violation of his contract, by attempting to subject the property to other obligations than those which were to be assigned to him, and by subordinating his security to that provided for the advances that were to be made by the trust company, and complains that the trust deed was in direct violation of the stipulations of his contract; that he had frequently demanded that it be reformed and made to conform to the requirements between him and the Pine Mountain Company, which had been refused; that the Germania Company held the property subject to the trust as written; and that it claimed to have advanced large sums of money, which it pretended were a preferred lien upon the trust. He also avers that the Pine Mountain Company, in violation of the contract, had wholly neglected and refused to pay, surrender, and assign to him the $100,000 of those liabilities outstanding which had been assumed by the improvement company, and this although he had frequently demanded that these claims be promptly paid and assigned to him. He alleges that the Pine Mountain Company is insolvent, and unable to take up and surrender them. He then avers that the outstanding liabilities are much less than $100,000; that he is not liable, and that the trust is not liable, for so much; and that he has long since been entitled to receive a reconveyance for the excess, which has not been done. The bill then sets up that the Pine Mountain Company, in violation of its agreement of August 10, 1892, refused to deliver to Blake certain obligations of the improvement company upon which the Pine Mountain Company was bound as surety, which obligations are described. He then states that at the time of the making of the contract of August 10, 1892, he was a very large stockholder of the improvement company, and became after that time a stockholder to a much larger amount because of that contract; that he was induced to make it because he believed that the Pine Mountain Company would promptly pay all these obligations of the improvement company, and turn them over to him so that they would be subject to his own control, except so far as he might choose to enforce the liabilities against the improvement company, which would thereby be relieved from pressure of these debts, whether

in the hands of the Pine Mountain Company or other creditors; and that their failure to do so prevented him from thus upholding the improvement company, whose credit was injured and impaired by this failure to assign to him these claims. He states that some $60,000 of these obligations, consisting of the purchase notes given by the Pine Mountain Company to the original vendors of the lands bought by the Pine Mountain Company, were therefore a prior lien to all other liens upon the land, and, in his hands by such assignments as he had provided, would have been available to him, because of such superior lien, as a security in his operations to protect the improvement company; that the Pine Mountain Company had refused after the 10th of August to pay, or since October 25th to have them paid and assigned to him, whereby he had sustained a loss nearly equal to the amount of these claims. He avers that the Pine Mountain Company refused to indorse the $8,000 of the commercial paper of the improvement company, whereby a heavy loss was sustained, and that the Pine Mountain Company had refused to pay the interest on the mortgage which he had made upon the Minneapolis property, and the holders were instituting a suit against him for such interest. He then sets out the failure of the Pine Mountain Company, under its contract, to convey 9 tracts of land, which are described, aggregating some 2,169 acres, which, under its contract, it was bound to convey to the improvement company, and that upon these lots there were vendors' liens which constitute a part of the $100,000 which the Pine Mountain Company agreed to pay and assign to him as prior liens against the lands of the improvement company. He also avers its failure to cancel certain interest coupons which had been paid, and the neglect of the Pine Mountain Company to pay another installment of interest on the Minneapolis property. He also avers that the Germania Company had, out of the trust funds, distributed certain sums pro rata to the bondholders, instead of taking up a number of the bonds and canceling them as required by his contract with the Pine Mountain Company. The bill then offers, in consideration of a reconveyance of the lots to him by the Pine Mountain Company, to return to it that which he had received under these contracts,—the $50,000 of stock, the $90,800 note, each of the other notes which he had received by assignment, and the $6,000 note which the Pine Mountain Company had indorsed for the Improvement Company,—and to do and perform all things necessary to restore the status before existing. It then sets up the fact that the deed of trust to the Germania Trust Company, by instigation of the Pine Mountain Company, did not truly set forth on the face of it the contract between him and the Pine Mountain Company in relation to that trust. It avers that the lots are worth largely more than $98,100, and prays that the contract of August 10, 1892, be canceled and annulled; that the deeds of August 29th, from Blake and wife, Wilcox and wife, and Angus and wife, conveying Minneapolis property to the Pine Mountain Company, be canceled and annulled, and the Pine Mountain Company be required to reconvey that property to Blake, and that the Germania Trust Company be also required to reconvey to him, and that the defendants be enjoined from conveying any part of the lands until this can be done, and for other relief.

The Pine Mountain Company answered this bill, alleging that it had transferred to Blake the $50,000 of stock and the $90,800 note, and four notes of the improvement company, and that it had secured for the purpose, and for a long time had been able, ready, and willing, and was now able, ready, and willing, to deliver to Blake, certain of the claims, amounting to $40,000, including the five claims described by Blake in his bill as not having been assigned to him; that it had indorsed $6,000 of the improvement company's paper, and taken the note of the improvement company for $2,000, which was treated as cash and accepted by that company; and that it was never under any obligation to deliver and cancel coupons to Blake. It then sets up the facts in relation to the conveyance of the Minneapolis land, and the mortgage that Blake had put upon it for $17,940; avers that this was not only after the contract was made, but after the appraisement was had, and that at that time, although the mortgage had been executed and recorded, the notes were still in the hands of Blake, and had not then been negotiated, which fact was concealed from the Pine Mountain Company; that he insisted that it should take land subject to that incumbrance, and take outlying Minnesota country

lands for the deficit, to make up the $100,000, which it was not in any sense bound to do, because Blake had no right to make the mortgage; avers that the property outside of Minneapolis had not been properly appraised; that, by reason of this mortgage imposed by Blake, the company had found it difficult to use the lands; and that it thereby became a serious breach by Blake of his part of the contract, which prevented them from promptly performing their part. It avers that the conveyance to the Germania Trust Company is substantially in compliance with the contract with Blake; that it was made with a view of having the trust company advance the money with which to promptly take up the obligations of the improvement company, so as to comply with the stipulation to assign them to Blake; and that all the money advanced by the trust company had been used only for that purpose, except the costs of administration., It denies that it was ever under any obligation to convey certain lands mentioned in the bill, as they were not within the $100,000 stipulation; that it had been compelled to pay for these lands, and was willing to convey them to the improvement company and Blake, if they would pay the amount of the purchase money; that there was a dispute about the Rice lands, affecting the title, and also as to a deficiency in acreage, for which reason those debts had not been paid, it being understood with the improvement company and with Blake that they were not to be paid until the title should be made good, and, as for other debts, they would have been paid, except that Blake, by not performing his part of the contract, and the embarrassment of his mortgage on the Minneapolis lands, and by his bringing this suit, had prevented the more prompt prosecution and progress of the process of paying off these claims.

The Pine Mountain Company also filed a cross bill which prayed that Blake should perform his part of the contract of August 10, 1892, and especially be required "to remove the incumbrances on the property in the city of Minneapolis" by paying off said mortgage in full, so that the land may stand clear and unincumbered, and that the contract of August 10th be reformed so as to show what was the true agreement between the parties.

The Germania Trust Company also answered this bill substantially to the same effect as the answer of the Pine Mountain Company, stating that, in consideration of the deed of trust, it had advanced about $60,000 to be used in taking up the various debts agreed by the Pine Mountain Company to be assigned to Blake, and that it had advanced money upon this deed of trust, for no other purpose; that the terms of the deed were in conformance with the terms of the contract between Blake and the Pine Mountain Company, but, if essentially different in any way, it was willing to have same reformed. Some of the obligations had been delivered to Blake, and it had about $50,000 of others to be delivered to him. It denied Blake's right to rescission as against it, or that he might have such right against the Pine Mountain Company to its injury in that regard, and insisted that the deed of trust should not be canceled until the money advanced under it had been repaid. It averred that the existence of the Blake mortgage upon the lands had very much embarrassed their sale, and further pleaded that it was, as to the money it had advanced, a bona fide purchaser for value, and without notice, as against any of the equities Blake had set up against the Pine Mountain Company.

Blake answered the cross bill of the Pine Mountain Company, in which he put in issue all of its averments; stating that it was not true, and that the notes mentioned in the mortgage, for $17,290, were owned entirely by him after the conveyance of October 25, 1892.

Martha G. Merriwether and W. D. Merriwether having filed a bill in the circuit court of the United States for the district of Kentucky to foreclose the deed of trust made by the improvement company to the Louisville Trust Company, that company on the 3d of January, 1894, filed its cross bill for the same purpose, alleging that, the two installments of interest not having been paid during the time limited, the mortgage deed had been declared to be matured, and thereupon a receiver was appointed to take possession of the assets under the deed of trust, which are being administered under that proceeding; and on the 16th day of February, 1895, Blake having had leave to file an intervening petition, these proceedings were consolidated with the bill for rescission, and the causes were heard together. In the main case the Southern

Land-Improvement Company filed its answer to the bills and cross bills for foreclosure, and its own cross bill, and substantially the same averments and defenses were made as those set up by Blake in his bill for rescission, and in the intervening petition which he filed, it being alleged, among other things, that at the time of the distribution of the debenture bonds among the stockholders of the Pine Mountain Company that company was insolvent; and it is also claimed that, in the execution of the trust, money paid into the hands of the trustee, which should have been applied to take up certain of the bonds, and their cancellation, so far as the money was sufficient, had been, instead of that, distributed pro rata among the bondholders. Inefficiency of the administration of the trust by the trustee, in making sales, and in conducting the matter of paying off the debts and relieving the liens, was also alleged. It is not necessary, however, to go into the details of these matters, as they are only incidentally considered on this appeal of Blake and the improvement company, in their relation to his prayer for relief by rescission, or on his intervening petition. That petition states the proceedings for foreclosure, and the nature and character of the contracts between the parties. It states that there were outstanding the obligations of the Pine Mountain Company to one B. A. Rice in the principal sum of $21,882.67; to one Tabitha Rice, an indebtedness of $10,941.33; and to one Moss about $12,000,—which indebtedness, represented by notes, was alleged to be a lien upon the lands described in the petition, prior and paramount to that held by the Louisville Trust Company to secure the debenture bonds. It then sets up certain mortgages made to the United States Savings & Trust Company upon certain of these lands prior to the bond liens, and another mortgage, for $10,000, securing notes upon which the Pine Mountain Company was liable, and covering certain parts of the lands conveyed to the trust company to secure the bonds, and also sets up an indebtedness to one M. J. Moss for the purchase money of a tract of land, and an indebtedness to the Monarch Coal & Timber Company et al. for 2,000 acres of coal and timber land, all of which were secured by liens, and were a part of the $100,000, the assumed obligations, which were to be paid by the Pine Mountain Company and transferred to him. The petition next sets out the bill for rescission, reciting its allegations in the very words of that bill, adopts and confirms them as a part of the petition, and insists that he was entitled to relief prayed for in that bill; and, if not, then that he was entitled "to have the Pine Mountain Company pay, and take up from the holders thereof, the obligations of the Pine Mountain Company hereinbefore set out, namely, the Rice debt, the Tabitha Rice debt, the Moss debt, and the debts held by the two mortgage companies, and the debts due to M. J. Moss and others and the Monarch Coal & Timber Company, and to have the said several lien claims surrendered, assigned, and transferred to him by the Pine Mountain Company as valid and subsisting claims against the improvement company, together with the liens on the several tracts of land securing the said obligations, and was entitled to have the said several liens enforced and foreclosed in this action, and have the lands covered by the liens respectively sold for the payment of the lien claims, and the proceeds applied to their payment, and that he was entitled to have assigned and transferred to him all the claims mentioned and agreed to be turned over to him in the contract of August 10, 1892, and to either convey additional lands in or near Minneapolis, in the state of Minnesota, to the value of the $22,000, or, if ordered by the court, to pay the $17,900 placed upon the Minneapolis property, and to convey additional lands sufficient to make up the sum of $100,000, according to his contract." The petition prays that the Pine Mountain Company "shall pay to the holders thereof the said several lien claims, and assign and transfer them to the petitioner, and that the said several lien claims shall be put in the hands of your petitioner as a lien prior and superior to that of the Louisville Trust Company, and that the lands shall be sold for the payment of these prior liens, and for such other and further relief." It also asks that the intervening petition be taken as a cross bill against all the parties necessary to effectuate this relief.

Upon these complicated pleadings, voluminous proof was taken, and the circuit court decreed: First, that Blake was not entitled to rescission; second, that the deed of trust executed to the Germania Trust Company was not in conformity with the contract of October 25, 1892, and directed that the trust

company should use the proceeds only for the purpose of taking up the obligations of the improvement company, which in the contract of August 10, 1892, the Pine Mountain Company had agreed to surrender and assign to Blake, and generally for the full performance by the Pine Mountain Company of its covenants and undertakings under that contract,—being allowed, however, to first pay the costs of executing the trust; third, that Blake should forthwith cause to be removed from the property embraced in the deeds executed by him to the Pine Mountain Company the $17,290 mortgage, of date August 29, 1892. In the foreclosure proceedings it directed, first, that the intervening petition of Blake be dismissed, and then proceeded to decree upon matters not necessary to mention here, but ascertained the amount of the debenture bonds outstanding in that cause to be $556,214.50, declared that the lien was a valid lien upon the property mentioned and described in the deed of trust, and gave the improvement company six months within which to pay the debt, and, if not so paid, directed that the property be sold for the purpose of paying the same, and distribute the proceeds to pay the cost and expenses of the sale, and to pay the certificates issued by the receiver, which may be adjudged hereafter to be superior to the liens of the bondholders, and then to pay the principal and interest of the bonds, for which a decree had been rendered, and the cause was retained for the further purpose of administration according to the decree.

The proof taken in the case very elaborately displays, in great detail, the exact condition of things existing at the critical dates of these respective transactions. It is not necessary, however, to set it out here, as the view the court has taken of the case renders any detailed consideration of these facts wholly unnecessary. A tabulated statement of the liabilities assumed by the improvement company under the contract of June 27, 1891, shows that there were outstanding balances due for the purchase of land in the sum of $71,-412.28, and for other debts than land purchases $45,737.72, making a total of $117,150; there being a dispute, not necessary to notice now, as to the excess of this amount over the $100,000 of "assumed liabilities." Another tabulated statement shows that on the 10th of August, 1892, there was due for purchase money of lands $61,920.23, for other items than the purchase money on lands $18,203.89, making a total of $80,124.12, and obligations of the improvement company, for which the Pine Mountain Company was a surety, for $36,727.84, showing that at that date the liabilities, including taxes and expenses, were $117,933.96, which, if credited with the disputed amount, $17,150, the Monarch and Moss land purchases, would make just the amount of the $100,000 which the Pine Mountain Company undertook to pay and assign to Blake by that contract, and for which he claimed to be subrogated to the lien of the original vendors, so far as there were vendors' liens. In addition to this, the note for $90,800, which was the ultimate amount due from the improvement company to the Pine Mountain Company for the balance of the unpaid purchase money over and above the debenture bonds and stock, was held by Blake, and is claimed to have been, under the Kentucky statutes and the general law upon that subject, also a vendor's lien upon the Kentucky lands conveyed to the Louisville Trust Company; and, inasmuch as it was the agreement that the debenture bonds should be taken as a payment of that much of the $1,050,000 original purchase money which they represent, it is claimed that this lien also is superior to the lien of the bonds, just as the original purchase notes would be liens in the hands of the original vendors, and that, when all these claims had been assigned to Blake under the contract, he would hold their liens to secure these sums of money by subrogation to the right of the Pine Mountain Company to claim them as liens for money paid as surety for the improvement company; the theory being that, the improvement company having assumed them, it became a primary debtor, and that the Pine Mountain Company, its surety, having paid the money that its principal had contracted to pay as purchase money, was entitled to the right of subrogation. Blake claimed the right to be subrogated in these liens to the position held by the Pine Mountain Company, as against the improvement company. The proof was taken to show that this was the intention of the parties to these contracts, and the facts necessary to effectuate their enforcement according to that intention. The proof further shows that the Germania Trust Com-

pany had paid on the debts of the Pine Mountain Company, by the advances that it made, the sum of $53,701.69, every item of which is challenged by Blake as being improperly paid under the Blake trust. He alleges that these claims were preferred because the directors of the Pine Mountain Company were indorsers on some of the notes, and these notes, with their renewals, are traced with great particularity in order to sustain this contention; but it is not necessary to go into this matter, further than to state the fact as one of the grounds Blake sets up for rescission. In a general way, it may be stated that the failure of the Pine Mountain Company to promptly take up and assign these claims to Blake, carrying their liens to him, is the chief ground of his demand for a rescission, and the proof is taken to show how he was injured by this failure. It would be important if such a right to the liens existed on his part. There are other grievances which he sets up, such as the refusal of the Pine Mountain Company to consent to the improvement company's cutting timber on the lands for sale in the market to raise the necessary funds to comply with the covenants of the lease which it had made to the Appalachian Company of Belgium, whereby it undertook to extend the railroad, and by their failure to do this it is alleged that the valuable lease was destroyed; the threatened loss of the B. A. Rice tract through litigation denying the title of the vendors of the Pine Mountain Company, still pending,— and the contention is that, until that controversy is settled, it is unfair to Blake and the improvement company that there should be any foreclosure under the deed of trust. The failure of title to some other parcels of land, the failure to transfer some railroad stock, the failure to convey the Moss lands and the Monarch lands, and the failure to pay the improvement company's liabilities are all set up in full, not only in and by the bill for rescission, but also as defenses against demand for a foreclosure, and as a set-off to the lien represented by the debenture bonds. The proof is further largely directed on both sides to show the negotiations which preceded the contract of August 10, 1892, and of October 25, 1892, and all that took place between the parties in relation thereto, with a view of showing that it was not the intention that Blake should place the mortgage he did execute upon the Minneapolis property, and also that it was the intention of the parties that he should have the prior liens represented by the purchase money; and it is further fully directed to the support on one side or the other of the case as to the interpretation of the contracts by the parties respectively, and in justification of these alleged violations of their respective duties and obligations towards each other, but it has no other effect, under the issues raised by the pleadings, than to show how far either side has performed his part of the contract, or failed to perform it, in relation to the issues made by the bill for rescission; and, in the view the court has taken of that question, it is not necessary to state that proof, and its bearing upon the issues made by the intervening petition. It is there no more effectual than on the issues made by the bill for rescission, this general statement being made only to explain the nature of the controversy as it appears in this record.

Humphrey & Davie, for Pine Mountain Iron & Coal Co. and Germania Safety-Vault & Trust Co.

Bullitt & Shields, for J. D. Blake and Southern Imp. Co.

Richards, Weissinger & Baskin, for Louisville Trust Co.

M. S. Barker, for Martha G. and W. D. Merriwether.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

HAMMOND, J. (after stating the facts as above).

The question of jurisdiction needs no very extended treatment, because it is governed by the decision of this court in a case where the ancillary or auxiliary jurisdiction of the courts of the United States, when they have possession of property by receivers, and are engaged in administering the trusts pertaining to it, had elaborate consideration, and a full examination of the authorities relating to

that subject.   Broadly stated, the principle is that from the inherent necessity of the situation, and to prevent injustice, those courts must entertain jurisdiction of any claim by any one whose rights or interests would be injuriously affected by the action of the court in dealing with the property and administering the trust;   certainly, if the suitor claim any lien on the property, or if he set up any right in or to the thing of which the court has possession.   How much beyond this the principle may extend when there is no technical lien or claim of it, but only an interest that is material, and may be compromised or injuriously embarrassed by the court's decree in relation to the property, we need not decide in this case.   But, where the auxiliary jurisdiction does fairly attach, those ordinary limitations which are imposed on original jurisdiction do not apply.   Compton v. Railroad Co., 31 U. S. App. 486; s. c., sub. nom. Compton v. Jesup, 15 C. C. A. 397, 68 Fed. 263.

The objection made to the jurisdiction of Blake's intervening petition is that he being an assignee of the Pine Mountain Company, which is a corporation of Kentucky, and that corporation and other necessary and indispensable parties to the suit being likewise corporations and citizens of Kentucky, his petition is subject to the prohibition of the act of August 13, 1888 (25 Stat. 433, c. 866, § 1; 1 Supp. Rev. St. 612), which forbids assignees to sue unless their assignors could have also sued, except where the instrument is made payable to bearer and executed by a corporation.   Wilson v. Knox Co., 43 Fed. 481.   It is argued that the instruments here involved not being within this exception, and Blake not having, on his own showing, any lien, but only a claim that the Pine Mountain Company should be compelled to assign certain alleged liens to him in order that he may enforce them, the circuit court was without jurisdiction.   It is also argued that new parties cannot be brought in by cross bill or by intervening petition, and that any original bill would be defeated by this want of diversity of citizenship between Blake's assignor and these necessary defendants.   The obvious answer, under the decision in Compton's Case, supra, is that whether the ancillary juisdiction be invoked by original bill, by cross bill, or by intervening petition, diversity of citizenship is not essential to its maintenance; and, as it then becomes a mere question of pleading or practice, if a petition may be resorted to the parties will not be put to either original or cross bills to bring in new parties in cases of administration by receivers, the petition serving every purpose if proper process shall bring them in.   We need not hold that the act of congress we have cited is itself subject to the implied exception in cases of the auxiliary jurisdiction we have mentioned, because, by its very terms, if the assignor might have prosecuted the suit in the federal court the assignee may.   The Pine Mountain Company could have done this.   It is true, the burden of Blake's complaint is that the Pine Mountain Company has violated its contract, and has not assigned the outstanding debts and liens to him, or, going further back, that it has not acquired them by paying the money due to the original vendors holding these liens which were to be assigned to him under his contract.   Thus it would seem as if neither held

a debt or lien to be enforced here. But this is only apparent, so far as it concerns the question of jurisdiction. The property now in the hands of the receiver of the circuit court, if Blake's contention be sustained, could be appropriated to his debt against the improvement company, if the fund be large enough, by a process of successive subrogations to liens that it is averred do exist somewhere, and are held by somebody who could be reached for any payment ordered in this case. He may be wrong in claiming any benefit of them, but this does not defeat the jurisdiction to inquire whether he be right or wrong in making the claim. This claim to the benefit of liens, real or imaginary, would be destroyed by the foreclosure sought in the original suit, of which the circuit court had confessedly jurisdiction, and can only be saved and enforced by proceedings ancillary to that suit; so that the case falls plainly within the principle of the Compton Case, supra, and the circuit court was justified in retaining the jurisdiction on that ground.

Moreover, it may be suggested that if Blake does not directly attack the existence of the lien which is being foreclosed in the original suit, to which his intervening petition is ancillary,—that is to say, the lien of the debenture bonds,—he objects to its immediate enforcement, and claims a preference over it. If he have only an action for damages for a breach of his contract against the Pine Mountain Company, the original holder of the bonds, and which is, as he contends, still the holder of them, and by a judgment at law could subject those bonds to the payment of his debt, or defeat their lien as against his own to be acquired through a judgment at law, he might come into the foreclosure suit, and ask to have it asserted and the property continued in the hands of the trustee until he could establish his judgment and lien; particularly where his claim for damages arises out of the very contracts which produced the bonds and their lien. If, as between him and the improvement company, he has, as he claims to have, a debt against it and the Pine Mountain Company, and the latter has, by its own contracts with him and the improvement company, disabled itself from appropriating this property to the lien of the bonds, this attack upon the lien to be foreclosed surely may be made by becoming a party to the suit, and then proceeding by cross bill or by intervening petition or original bill, any of which would be ancillary to the original jurisdiction. It is true that Blake's intervening petition is confined to a theory of subrogation to previously existing liens, and does not seek to reach the assets otherwise, as by judgments at law against the improvement company or the Pine Mountain Company, or both, nor by asking the circuit court in equity to establish such legal rights by issues to a jury or reference to a master; but he has in that petition a general prayer for relief, and a pending original bill for rescission in the same court of equity, also with a general prayer which was heard along with the original foreclosure suit and his intervening petition therein; and having this general jurisdiction of the whole subject-matter, and all the parties before it, there could be no difficulty in administering whatever relief he would be entitled to under the circumstances of the case. In a suit for general administration of a trust by fore-

closure of a mortgage, where the classification of liens and preferences takes place, particularly in the cases of those commercial mortgages of corporate property which are essential instrumentalities of corporate enterprises, the usual strictness of pleading is not required by those who come in to assert their claims to the property, or for payment out of it. Oftentimes claims may be proved and allowed before a master without technical pleading of any kind, and when once the suitor by petition is in court, with proper parties, the court may and generally does grant whatever right or relief he may have, without that strictness of pleading which in other classes of litigation might be required. If occasion arise for technical procedure, the court can order it, even to the trial of issues by a jury, if necessary or desirable. Therefore we may dismiss that severe scrutiny of the pleadings which has been had in this case, and consider whether Blake is entitled to any of the relief which he has urged as due to him, on the facts as they appeared at the hearing of all the cases together,—a procedure notably proper in this litigation, where the contracts themselves are so intimately interwoven and dependent on each other.

The chief impression made by the examination of this case is that the principal parties were engaged, without money, in enterprises especially speculative in their character, requiring the use of large sums of ready money and time for that development which should bring remunerative returns for the capital invested. That capital was not forthcoming, in this instance, except as it should spring out of success in the contemplated sales of corporate credit, so often the main, if not the only, basis of similar enterprises, some of which are successful, but many of which utterly fail, as this did, by the miscarriage of the great expectations in that direction, at once involving interested parties in mutual incapacity to carry out their contracts with each other. When ready money was needed, resort was had to the use of lands in large quantity,—a use likewise speculative in character, and requiring time to produce the money; and when these expectations again failed the parties sought to throw the blame on each other, as excuses for nonperformance of prompt payments, which they knew could not be made if these failures should occur. Whatever grounds for the failure of these expectations may be found in a general financial depression and panic, primarily, they rest on the inability of the parties to meet their obligations incurred in the delusions of hopeful speculation, which delusions appear abundantly by the proof in this case. It is just these hardships which a court of equity cannot relieve by rescinding contracts, or making new ones by construction, through the process of balancing blame for nonperformances, and going into parol proof of other or different intentions than those expressed in the contracts themselves,—intentions relating to failures not anticipated at the time the contracts were made, or not provided for by the terms of the agreements, as they would have been if the parties had not been improvident in neglecting such protection as was open to them against possible failure and change of conditions. The reasonableness of a contract, its fairness and justice, are to be determined as of the time when the parties en-

tered into it, and so of the intentions involved in the construction of their agreements, and none of these are to be influenced by the force of subsequent changes in events or circumstances.     Fry, Spec. Perf. p. 193, c. 6.   It may be an improvident contract, but improvidence or inadequacy does not determine a court of equity to rescind, or to decree against specific performance.     Sugd. Vend. c. 5, § 3.

"The question of the want of equality and fairness, and of the hardship of the contract, should, as a general rule, be judged of in relation to the time of the contract, and not by subsequent events. We do not intend to say that the court will never pay any attention to hardships produced by a change of circumstances, but certainly the general rule is that a mere decline in values since the date of the contract is not to be regarded by the court in cases of this nature." Lee v. Kirby, 104 Mass. 420, 428; Marble Co. v. Ripley, 10 Wall. 339, 356.

These authorities are cited and quoted, as we quote them, with approval, in Telegraph Co. v. Harrison, 145 U. S. 459, 472, 473, 12 Sup. Ct. 900.   And again:

"The legal effect of a transaction cannot be altered by the subsequent conduct of the parties, and it makes no difference if that conduct be founded on a misapprehension of the original legal effect. A man who acts on a wrong construction of his own duties under a contract he has entered into does not thereby entitle himself, though the acts be done for the benefit of the other party, to have the contract performed by the other party according to the same construction." Wald, Pol. Cont. 402.

Nor does the fact that a party has not performed his contract even according to its legal effect necessarily entitle the other party to rescission, if either or both have partly performed, and circumstances of embarrassment have thereby arisen which make it impracticable to restore the status quo,—not merely in title or ownership, but likewise in relative advantage and use of the thing restored, when the nature and exigencies of the business about which the contract was made are considered.     Marble Co. v. Ripley, supra, where the court remarks "that one party to an executory contract partly executed has violated his engagements is generally no sufficient reason for a decree by a court of equity, at the suit of the other party, that the contract shall be annulled."     And at last neither the specific performance of a contract, nor its rescission, is a matter of absolute right, but is wholly within the discretion of the court, not arbitrarily or capriciously exercised, but always with reference to the facts of that particular case, and the established rules of equitable action.     Hennessey v. Woolworth, 128 U. S. 438, 442, 9 Sup. Ct. 109; Delaine Co. v. James, 94 U. S. 207, 214; Kimball v. West, 15 Wall. 377; Eyre v. Potter, 15 How. 42; Grymes v. Sanders, 93 U. S. 55; Town of Springport v. Teutonia Sav. Bank, 75 N. Y. 397, 402; Story, Eq. Jur. §§ 393, 394; Beach, Eq. Jur. §§ 566, 634; Id. § 551 et seq.; Wald, Pol. Cont. 521 et seq.   Some of these cases cited to illustrate this general rule have more particular reference to points which appear in this case. In Eyre v. Potter, supra, the nonadmissibility of parol testimony to vary, alter, or contradict a deed was urged, as here it has been; and, while the court does not direct attention to it especially, the proof was admitted and discussed, and guided the court in affirming the decree, and was admitted, not only to enlighten the court in the

construction of the contract by the light of the circumstances then existing, but to enable it to adjudge of its fairness and freedom from inequitable infirmities, though not in any sense to alter it. It was ruled that mere inadequacy of consideration does not establish either unfairness or fraudulent motives. In Kimball v. West, supra, it was ruled that, where one has a covenant of warranty against defects of title, he must rely on that remedy, unless some loss has been imposed by delay in perfecting title, and even then, if the injury is remedial in damages, a court may refuse rescission. In Delaine Co. v. James, supra, to rescind a contract was held to be an extraordinary power, not to be exercised except in a clear case proving the fraud, or other equitable foundation for the rescission. In Grymes v. Sanders, supra, it was said that:

"A court of equity is always reluctant to rescind unless the parties can be put back in statu quo. If this cannot be done, it will give such relief only where the clearest and strongest equity demands it. Here the appellant secured the money paid on the contract in entire good faith. He parted with it before he was aware of the claim of the appellees, and cannot conveniently restore it. The imperfect and abortive exploration made by Bowman has injured the credit of the property. Times have since changed. There is less demand for such property, and it has fallen largely in market value. Under the circumstances, the loss should not be borne by the appellant."

It is upon such considerations as these that a court of equity proceeds in exercising its discretion whether it will rescind a contract, specifically perform it, or leave the parties to such remedies as they may have at law for the breaches of their contract; this being the innate remedy afforded by our law for all breaches of contract, and deemed sufficient, except where the peculiarities of the case permit an interference by, or aid from, a court of equity. We shall have occasion to return to this case when we come to consider that restoration of the status quo which must precede a rescission of any contract, as applied to the facts of this case.

Counsel on both sides cite and quote what has been said on the general subject in 21 Am. & Eng. Enc. Law, 44. A general examination of the cases there grouped is impracticable, if not impossible, and we omit the task; but we may usefully call attention to a distinction, to be noted in examining all authorities, between that kind of voluntary rescission which the parties, or one of them, may elect to make for himself, and take the consequences at law, and that kind which a court of equity compulsorily may enforce. They are not the same, though closely analogous. Of the former kind was the case of Ankeny v. Clark, 148 U. S. 345, 13 Sup. Ct. 617, cited for the appellant here; and so was Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, also cited for him. And so, again, was Miller v. Phillips, 31 Pa. St. 218, and Lauman v. Young, 31 Pa. St. 306, from which quotations are made, that if there be no performance within the time stipulated the contract may be rescinded, and that a defective, worthless, and negligent performance is no performance at all. This may be so both at law and equity, but because, acting upon it, the parties may voluntarily abandon or rescind the contract, and successfully sue or defend at law for nonperformance, it does not follow that a court of equity will also rescind for nonperformance. It often

will not, but leaves the parties severely alone with their legal remedies, as in Kimball v. West, supra, and hundreds of other cases, no doubt. If nonperformance does not always authorize a court of equity to compel rescission, partial or worthless performance will not any more authorize it. Voluntary rescission and compulsory rescission are two different things, and one may have rights and remedies against one who wrongfully rescinds voluntarily, or refuses to perform, that are not identical in principle or results with those to which he may be entitled when he wishes to enforce a rescission unwillingly upon the adversary party. The broad distinction between that which a party to a contract may safely assume to do in abandoning or rescinding it, and then either defending a suit for a breach or submitting to damages rather than perform it, and the right to demand rescission in a court of equity, should not be overlooked, or there may be a confusion of principles governing the rights of the parties in the two classes of cases. The case of Kentucky River Nav. Co. v. Com., 13 Bush. 435, unlike these last, was indeed a case of rescission in equity, where the remedy was properly applied, not because the company was insolvent, and damages at law could not be collected, thus resulting in a right of rescission, since specific performance was impossible, as urged by counsel, but because, in the nature of the covenant itself, actual, physical performance was the only substantial interest the commonwealth could have had in the lease, and irremedial mischief would result from either imperfect or non performance. It was the covenant of a lessee to repair dams, and otherwise make navigation improvements, so as to produce a continuous navigation; and manifestly, as the court says, no damages at law could be adequate. Nothing less than the doing of the work could suffice, and the company, being insolvent, could not do it. But the court does not hold that, if money damages would have compensated, the insolvency of the party breaking the contract would have been a ground of rescission, but quite the contrary. We do not say that insolvency, or inability to respond in damages, is not to be considered, along with all the other facts, in determining the question of rescission, but only that there is not an absolute right of rescission because of it, where an action at law is the proper legal remedy for redress, as upon a covenant of warranty against defects of title in the sale of real estate. Nor is the violation by a trustee of the requirements of his trust, or a partial and preferential administration of them, a ground for rescission, when there is such abundant redress by proceedings to remove him, or to control his action by injunction or decree, adjusting his accounts in the settlements that may be required of him according to the demands of the trust and the legal rights of all the parties.

In the application of these principles of law, and in the view we have taken of this case, it is not necessary to follow in detail the elaborate completeness of the arguments that have been made with such fullness of treatment by counsel on both sides. As was well remarked by the learned judge who tried the case at the circuit, there can be no disagreement with counsel as to most of their propositions of law as to the right of sureties or others to be subrogated

to the liens of creditors whose debts they have paid. But the difficulty here which demands so much argument arises, not only out of the fact that the debts have not been paid, but also out of the impossibility, without perversion, of adjusting these familiar doctrines of equity to the attitude Blake has, assumed by the very contract he made during the transactions involved in the litigation, whether we look at them as applying to his demand for a rescission, or that for a specific performance of them according to his construction of the contracts. Both sides rightly contend that all these contracts must be construed together, they are so interwoven with each other into one whole scheme of operations, in which the parties were all engaged. There are fifteen of them, as we count them in the record. They change with kaleidoscopic rapidity in their presentation of differing designs for raising the ready money so much needed, or substituting corporate credit for it, or the use of large quantities of land in lieu of it, but they never change in the one certain feature of the whole scheme, that the debenture bonds should have a paramount lien for their payment; and yet the formidable struggle Blake makes in this record wholly depends upon displacing that preferential lien of the bonds, and substituting a preference for himself not specifically provided for by the contracts, as it might and should have been if that were the intention, but by a process of artificial subrogation to the liens of the original vendors of the Kentucky lands,—not directly, but by a kind of process of tacking one subrogation to another, the Pine Mountain Company being first subrogated to that lien of the original vendors which was held by them to secure the Pine Mountain Company's own notes for the original purchase money, the "assumed liabilities" of the improvement company, and then the subrogation of Blake to the right of subrogation of the Pine Mountain Company,—and all this in respect of the most fragile of all liens known to a court of equity, one most easily displaced, and never existing except by the clearest implication of the intention of the party that it should stand as a security for purchase money yet unpaid: the naked, equitable, vendor's implied lien for purchase money. Besides this, there is claimed a kind of subsidiary subrogation, but more directly, to the lien of the Pine Mountain Company for the "unpaid balance" which constituted a part of the consideration of the purchase of the lands by the improvement company. And this is the same implied vendor's lien, never arising for unliquidated or uncertain demands, or for breaches of covenants, nor where it is clearly manifest that it shall not exist, which is always defeated, presumably, by the payment of the money, or the receipt of some other thing taken in lieu of money; is never transmitted to another, except upon the most imperative demand of equitable justice, as where one who actually pays is compelled to pay another's debt in behalf of the original purchaser, and may be then substituted to the lien of the original vendor as against that purchaser whose debt he has been compelled to pay, which is generally lost by taking other security, or by a clear manifestation of nonreliance, and is largely a personal privilege of the vendor, and not assignable. Jones, Liens, §§ 1061, 1064, 1071, 1073, et seq.

But we are relieved somewhat from going into this class of questions, so suggestive here of application to the peculiarities of this case, since the contention of Blake may be conceded,—though it is doubtful if the authorities cited go so far,—that in Kentucky a vendor's lien has greater strength than that which this general law gives it, and is in all respects as if the lien had been reserved in the deed, or has the same force as a mortgage for the purchase money. St. Ky. 1894, § 2358.　Yet Blake is, with that concession, in no better attitude to displace the lien of the debenture bonds, for the simple reason that the contracts, by their terms and necessary implications, preclude any such displacement.　It would have been a senseless thing for the Pine Mountain Company to have made a mortgage on the Kentucky lands to secure the performance of its part of the contract made with Blake, construing the contract as he now, in the changed condition of affairs, construes it.　Why should it have done so, and what could it have gained by it?　The Minneapolis lands having been appropriated by Blake, as its paymaster, to the payment of the improvement company's "assumed liabilities" to the Pine Mountain Company, as its creditor, to have surrendered its own holdings of the debenture bonds as a prior lien, and given a preferential lien on the Kentucky lands to Blake to reimburse him for these same debts, would have been a mere shifting of its creditors, and to devote the whole of its land holdings to secure only those debts, leaving for itself nothing else as a consideration for its sell-out to the improvement company, except a blind confidence that the improvement company would so manage the enterprise of development that the bonds and the debts would both be paid, and that the speculation would turn out successfully, and not disastrously.　This confidence was more naturally and properly Blake's than that of the Pine Mountain Company.　Being substantially the sole owner of the stock of the improvement company, he might have had justification for such reliance on its capabilities, or on his own as the owner and manager; but it is not one that a court of equity will impose unwillingly on the other contracting party, whose dealings imply, from the simple existence of this contract with Blake, and the very nature of it, that it did not have that confidence in the new company doing better than itself had done.　Securities like these are made to assure against possible failures, and not to assure reckless confidence in others; and looking to such a possible failure as an inducement to taking the securities,—a failure that has come and has caused this litigation,—and to this anticipation as one by which the contracts may be construed, and they plainly imply, on the face of them, that there was no intention to give Blake any such security for his confidence in his own company as that which he now seeks to dig out of them, but rather to provide against possible losses that have been realized.　In other words, the sale of its entire property was made for its own benefit; and it must be taken to be dealing with that in view, and not for the benefit of Blake, who at the time the debentures were provided for was unknown to the transaction, and who afterwards came in, not, as has been argued, as one seeking and willing to relieve the Pine Mountain Company of its embarrassments,

and occupying the place of a purchaser from it for that purpose, but as a paymaster of his own company, which had purchased the property. It is clearly obvious, therefore, that a court of equity will not disturb such contracts, and by implication impose stipulations which it would have been unwise or foolish for the party to make, except upon the most imperative compulsion of consideration for incontestable facts and circumstances, that leave no room for a doubt of an intention to be so bound. And here it may be further remarked that we know, as we know other habits of men in business and commercial intercourse, that in such enterprises as this the first care of those engaged is to provide for the bonds to be floated on the market every guaranty of priority and security of lien that it is possible to create, and all such contracts should be sustained, to that end. Here the very use of the word "debenture" implies this, and it is generally sought to so name or designate or describe and stamp the bonds with some such catchword as shall attractively indicate their priority and security. Again, the lien of these bonds is the only lien placed specifically on the Kentucky lands, either by the original memorandum of agreement of June 13, 1891, the confirmatory agreement of June 27, 1891, the modifying contract of January 6, 1892, or that of January 25, 1892, or the deed of February 1, 1892, and, more than all, the ultimately binding and speaking mortgage itself, in which all these contracts were concentrated,—that instrument which closed all negotiations on this subject, and within which the rights of the parties must be confined. Except—and this exception is of itself conclusive against any thought then existing that any other lien could displace that of the bonds—that in the modified contracts preceding the mortgage of the Kentucky lands to secure the bonds, and in the mortgage itself, there was provided for these very "assumed liabilities," a special lien by mortgage on certain designated parts of the property, at the option of the improvement company, namely, on the "Moss farm" and the "town property," which mortgage was to be, if executed, a lien "prior to the lien created by this deed of trust," as expressed in the mortgage, and "which shall be a first lien upon the property," as expressed in the memorandum agreements preceding it. Although this was never carried out, the existence of the provision shows there was in mind an intention to make the bonds always paramount, unless especial liens were provided otherwise. Besides, the intention is positively shown by the extreme care exhibited in providing against this possible diminution of the quantum of security for the bonds, by substituting another and additional security for them by a deposit of the stock subscriptions of approved solvency; and, more than all this, the bonds were further secured at one time, in these contracts, by a provision that, "to secure the payment and hasten the redemption of the said debenture bonds," all the other assets which had been sold should constitute a trust fund in aid of the mortgage on the Kentucky lands, which was to be and is exclusively to secure the bonds. Nor is this yet all of this kind of evidential circumstance. By all the terms of these agreements, one and all, it can be seen that the central force in the whole scheme, so far as the Pine Mountain Company was dealing for itself, was ex-

ercised for the protection of these bonds. The various modifications of the stipulations of the contracts from time to time, the reduction in the amount of the bonds, everything shows conclusively this one fact,—the bonds were to be secured above everything else.

Now, to us, it is inconceivable how Blake and his legal advisers, when they came to thus study these contracts, and saw how exclusively the lien on the lands was made for the benefit of the bonds, and how everything had been centralized for their protection, could for one moment imagine that they might safely rely on this process of building one subrogation on another to reach a prior vendor's lien, or how they could conceive that they might safely treat the bonds as a payment pro tanto of that much of the original purchase money, or else as secured to be paid by the trust deed, and therefore not entitled to any equivalency of vendor's lien, and the other part as not paid, and therefore entitled to a vendor's lien, thus establishing an independent and supplementary vendor's lien as a preference over the bonds for the "assumed liabilities," and then going back, if this failed, to the initiatory lien of the original vendors to the Pine Mountain Company. We say, if they had any such intention as this, it should have been expressed in the contract, and, not being so expressed, the absence of it is conclusive as a manifestation that the parties never contracted in view of any reliance on such a lien,—a manifestation always fatal to any claim of the vendor's lien. They were expressing their agreements in writing with great particularity, and as the vendor's lien is, at last, only substituting an agreement by implication for one existing, but omitted from the writing, if the facts show there was a manifest intention not to make such an agreement it is never implied and forced upon the parties. We quite agree with counsel for the appellees that this whole conception of subrogation is an afterthought born of the losses and misfortunes which bear heavily on one who has made an improvident contract, as it turns out, but against which, we have shown, equity cannot relieve. As was said in Grymes v. Sanders, supra, those losses growing out of a change of times and fall in values should not, on the circumstances of this case, fall on the appellees. They possibly were selling out in view of the fact that they anticipated such changes, and the improvement company and Blake were buying because they had more courage to meet or confidence to sustain the prospects of the future. In the nature of the circumstances surrounding the contracts, Blake assumed these losses.

Nor is there wanting circumstantial evidence, to be found in the provisions of the contract Blake himself made, of an absence of any reliance upon, if not a prohibition of, such a subrogation, in Blake's favor. The interest coupons he was to pay, and which were indeed a lien in his hands, as part of the debenture bonds, were to be canceled before delivery to him. Why? Because they were to be delivered to him, like the rest, only as vouchers of his payments in behalf of his company, of which he had become almost the sole owner, to be used in settlement with that company, but to be canceled because, as to the Pine Mountain Company and the holders of bonds, they had been paid; Blake being, as to that company, a paymaster,

not a purchaser, and should therefore no longer share in the lien. This is as fully indicative of the transaction and true relation of the parties as anything could well be. Again, the note for $90,800 was also considered, in the same sense, as paid with the Minneapolis lands, and no longer in any wise alive as a lien, if it ever could have been a vendor's lien, which is doubtful, on the peculiarities of this case; for it was to be deposited with the Louisville Trust Company in trust "to abide the payment of the bonded debt," etc. This is unusual language, but the whole of the second paragraph of the contract of August 10, 1892, is devoted to a careful safeguarding against any use of this note by Blake to deplete the resources of the improvement company until the bonds should be paid. He was to have title to the note, and the Pine Mountain Company was to do nothing to render it invalid, but all "without recourse" on that company. In respect of this scheme, why should the "assumed liabilities" have any other force in the hands of Blake than the coupons and note had? And the very next paragraph fully explains that, with the same purpose, the other obligations were, "without recourse," to be assigned to Blake with all necessary and proper indorsements, "all of which are to be valid and binding as against said last-named corporation, and said second party shall be fully empowered to collect, adjust, or secure for and upon his own account said claims, and all thereof, of and from said Southern Land-Improvement Company." Could language be plainer than this to show that Blake was to be paymaster, and to have these papers as vouchers to establish his claim to be reimbursed and repaid by the improvement company all that he had paid on these debts, and only for that purpose were they to be assigned to him "without recourse" on the Pine Mountain Company? It would be the most effectual "recourse" now to appropriate the Kentucky lands of the Pine Mountain Company sold by this very "deal," as it is called in argument, to the uses of Blake by this subrogation process. It would be, indeed, to "rescind" this contract, and substitute one by which the Pine Mountain Company would be selling the lands for substantially nothing, if the prior lien of the bonds is to be displaced. It is a somewhat ingenious method of shifting all the loss of the speculation on the original owner, who had sold out, or forcing the Pine Mountain Company to pay the debts of the improvement company, in place of Blake, who had promised to pay them. Here, in this paragraph 3 of the contract of August 10, 1892, was the place for the parties to provide a lien on the Kentucky lands, by subrogation or otherwise, if any were intended, to enable Blake to do that thing.

There is some plausibility in the argument made for Blake that the "recourse" provided against by the above clause was that personal recourse usually meant when commercial paper is assigned or indorsed with that phrase overwritten, but it has a larger meaning here, obviously. This was not the bare indorsement without recourse, in ordinary business, of current notes, due or past due, but a stupendous transaction, of a complicated nature, involving mortgages, liens, trusts, and what not, for vast quantities of lands and other assets; and "without recourse," must be held, in that associa-

tion, to mean without any kind of liability whatever, direct or in-direct, personal or by liens on property. No kind of recourse was reserved among the stipulations, and none can be inserted in them. The whole contract secured, among other things, a clear release of the Pine Mountain Company, and all its property, debenture bonds and all, from any further liability on these old debts, procured, as the release was, by a sale of its property, this part of the considera-tion being taken in Blake's lands in Minnesota. The Pine Moun-tain Company was to pay the debts, "within thirty days," which Blake's company had, under previous contracts, bound itself to pay; but, being unable to comply with this requirement, Blake paid what was believed to be an equivalency in lands, and the very nature of the transaction demanded this broad release. Blake's fulfillment of the improvement company's obligation to assume these debts neces-sarily released the Pine Mountain Company from them, or it had no benefit of the transaction; and the fallacy of Blake is in now taking for granted that he is, by this proceeding, pursuing the improvement company and its property for reimbursement, when in fact, if he can displace the lien of the bonds, and substitute one for himself, he is compelling the Pine Mountain Company to reimburse him, and this without any consideration whatever; for in effect he thereby receives back the value of the Minnesota lands which he appropriated to pay his company's debts, and thus saves himself from that loss by throw-ing it on the Pine Mountain Company.

Also it is argued, on the maxim, "Expressio unius exclusio alterius," that the careful provisions of this contract to exclude any lien for cou-pons paid by Blake, and that the $90,800 note should "abide" the pay-ment of the bonds, imply that all the other things to be assigned to Blake were to be assigned with liens through subrogation, as against the bonds. But these were assigned "without recourse" like the others, and the whole series of contracts shows that the "assumed lia-bilities" stood upon the same footing, that there are no necessary dis-tinctions between them, and that those made by Blake are forced to meet the exigencies of his case. The $90,800 stood on a somewhat different footing than the coupons, and, being originally a part of the consideration for the sale of the Kentucky lands, it was supposed that, unless it was postponed to the bonds by special stipulation, Blake might try to use it to the detriment of their security, as he is now try-ing to use the "assumed liabilities," it not occurring to the Pine Moun-tain people that he could so attempt to use these last. Undoubtedly, by this contract of August 10, 1892, the Pine Mountain Company was under an obligation to speedily pay the $100,000 of "assumed liabili-ties," get them out of the way of Blake's Southern Land-Improvement Company, and deliver them to him "without recourse"; and if after the 30 days expired he had filed a bill promptly, to rescind the con-tract, there might have been better grounds for this equitable relief, not because assignments of the claims with liens which could have been made available had not been made, for he had no such liens, but because the $100,000 had not been paid to release the pressure of the "assumed liabilities" on the improvement company in the hands of clamorous creditors, and place them in the friendly and indulgent

hands of that company's more confident, and courageous paymaster and substantial owner. But he did not do so. Out of an abundant confidence in his ability to manage this enterprise successfully, he wished to hold onto the advantage of using his Minnesota lands as the equivalent of this $100,000 of "assumed liabilities," and to the other considerations of stocks and stock notes which he would get; and therefore, instead of demanding compliance, as he might have done, with the contract of August 10, he entered into the subsequent and modifying contract of October 25, 1892, by which he disabled himself from asking that relief. Whether the Pine Mountain Company had any excuse, in Blake's own conduct, in dealing with his assumed right to place a mortgage for $20,000 on the Minnesota lands, reserved in that behalf, or not, or whether its failure to pay arose from sheer inability to comply, which is more probable, on the proof, Blake by that subsequent contract excused its noncompliance by substituting another mode of accomplishing the purpose of paying the outstanding debts of the improvement company with his Minnesota lands. It is immaterial just here whether he released the Pine Mountain Company from its obligation to pay the $100,000 by taking up the debts or not. He forgave the obligation to do this in 30 days, and set about doing it by a trustee taking the matter in hand; and, whether rightfully or wrongfully, that trustee having assumed to advance money in aid of the trust, there is no longer any hope of rescission without a preliminary return of those advances. To what extent the trustee has done this is immaterial, since it has made advances to some extent; and there is now raging in this record a complicated controversy with that trustee, not only concerning the advances, but also as to its administration of the trust. The trust has been all the time in process of execution, and, whatever may be the rights of Blake in compelling the trustee to conform its administration to his just and equitable claims upon it, the very existence of the trust, and its partial or it may be imperfect administration, make a rescission of these contracts, in the view a court of equity takes of rescission, a simple impossibility, because it is impossible to undo what has been done, and restore the status quo. The process suggested in argument, of settling up the trustee's accounts by first denying its lien for advances, and strictly holding it to credits for that which has been strictly applied under the trust, may do in adjusting its accounts, and compelling it to do that which is right; but the necessity of doing this in itself complicates and delays the restoration of the status quo in such a fashion that the discretion to which we have adverted should refuse rescission as a remedy to Blake, because that condition must of itself be an end of his demand for that relief.

We think it quite clear that, in drafting the deed of trust to the Germania Company, Blake was overreached by subordinating his interest to others involved, and that it was unfair to him, but it was, except as a complication, comparatively harmless; for a court of equity, without reforming the instrument at all, would compel the trust to be conformed to the purposes of its creation, as expressed in Blake's contracts of August 10 and October 25, 1892, and besides the decree below has so reformed it. Hence the overreaching in this

respect can be no ground for a rescission of all the contracts. Nor is this all. Blake has so interlaced himself with this whole series of 15 contracts that rescission could only take place by annulling each and every one of them, from that of June 13, 1891, between the Pine Mountain Company and Southern Land Company, to the very end, as found in that of November 7, 1892, creating this trust to the Germania Company. It is idle to think of such a rescission, and yet one has only to read the series of contracts to see that it would be inequitable to undertake rescission without restoring the status quo as it existed prior to June 13, 1891. The Pine Mountain Company should have back its property as it then was; Blake should have his property as it was August 10, 1892; the Southern Improvement Company should have its status restored by a return of its stock and money paid out; and without all this there can be no rescission. But while this contract of October 25, 1892, and what was done under it, have made impossible such a restoration to each of his own as would justify rescission, it has not, in any sense, disturbed by its stipulations that inexorable privilege of priority of lien for the debenture bonds to which we have referred as being established and fully recognized by all the preceding contracts. Neither in the changed scheme of paying the outstanding obligations of the improvement company with the Minnesota lands, by placing them in the hands of a trustee for that purpose, instead of a direct transfer of them to the Pine Mountain Company, with a requirement that that company should almost immediately pay the debts, nor in any other part of the contract, can we find the least indication of any desire or intention of altering the contracts in that respect. On the contrary, it is in harmony with the contract of August 10th preceding, in all the indications we have mentioned, except that one phrase is a little stronger than before; for, when treating of an assignment of certain of the notes already taken up by the Pine Mountain Company, it says, "Each of said notes is assigned to J. D. Blake by said Pine Mountain Company without any recourse on it for any purpose whatever," which is a confirmation of our interpretation of the extent of the phrase "without recourse" in the former contract.

Heretofore we have treated the construction of these contracts in respect of this assumed right of Blake to a subrogation without regard to that perhaps more satisfactory ground upon which the learned judge at the circuit denied it,—that of the general warranty of the deeds conveying the Kentucky lands to the trust company. That view is equally as conclusive, but, if it were not, we should have affirmed the judgment for the reasons we have stated. Not only does the improvement company warrant against all defects of title to the trust company, in a deed made exclusively to secure the debenture bonds, but the Pine Mountain Company, in conveying the lands to the improvement company, had done the same thing with this view, and in aid of the trust deed, which was so exclusively to secure the bonds; and, as against these warranties, it would be utterly impossible for the Pine Mountain Company to claim a lien in preference to the bonds, whatever it might do if it had been compelled, under other circumstances, to pay the lien claims which the improvement company had assumed. For the reasons we have stated, the par-

ties must be held to have thus secured the bonds against all hazard by the warranties of a trust deed having no other object than their paramount security, this being the only legal effect of the recitals in the technical deeds, and fully sustained by the recitals of the previous memorandum contracts leading up to the deeds, which comes to the same thing we have said before,—that a vendor's lien is never implied against warranties in any case where the circumstances show that the existence of such a lien could not have intended, and would be in antagonism to the manifested intention to clear the title of such impediments. The reasoning of the learned judge in the opinion which comes up with the record is conclusive on this subject, and we need not repeat it here. Along with the warranty in the mortgage for securing the bonds is a full reference to the previous deed of the Pine Mountain Company and the other contracts; the part of the original purchase money embodied in the bonds is segregated and secured by the lien of the mortgage, and not any other part of the consideration is mentioned as secured, and no other part was attempted to be secured in any specific way; additional security for the bonds is given by a certain pledging of the net proceeds of sales of stock; a certain optional mortgage on particular portions of the property, which shall be prior to the lien for the bonds, is provided for the assumed liabilities; a still further provision is made for the bonds by applying 25 per cent. of the net proceeds of sales of stock; and at last a further optional sale of town lots may be made for improving property, if the Pine Mountain Company "does not think the security for the payment of its bonds is thereby impaired." Now, in the face of these concurrent deeds and contracts of February 1, 1892, these warranties must have been intended, in the hands of the parties themselves, to cover absolutely all defects of title,—as well the original vendors' liens as others,—for this protection to the bonds was manifestly a part of the scheme. Nor is it the least against this position that in the preceding contract of June 27, 1891, the vendors' liens were expressly excepted from the promised general warranty of the property to be conveyed. Of course, the Pine Mountain Company did not intend to warrant against those liens known to exist, and which the grantee, the improvement company, agreed to remove in exoneration of the bonds; and of course, if the grantee failed in that obligation, and the grantor should pay the lien debts for the purchase money, it would have a right of subrogation to that vendor's lien, as against the grantee. But non constat that this lien, in the grantor's hands, would be prior to the lien of the bonds, which both grantor and grantee had provided should be prior to all else, as we have shown. As long as these vendor's liens were outstanding in the hands of the original vendors, it was not within the power of the contracting parties to subordinate them to the lien provided for the bonds; but the moment they come into the hands of the Pine Mountain Company that subordination takes place necessarily, by implication, as much as if the contracts had said in plain words, "and if the Pine Mountain Company shall pay any of the liabilities assumed by the improvement company, as part of the purchase money, the liens attached thereto shall be subordinate

to the lien hereby created in favor of the debenture bonds aforesaid." And as to the other consideration of purchase money, not included in the bonds, the "assumed liabilities," and the rest, for the very same reasons precisely, whether under the Kentucky statute or the general law, if the Pine Mountain Company can be held to have any vendor's lien it is subordinate to the contract lien expressly given for the bonds by the selfsame contracts, as plainly as if the deeds had said, "And any vendor's lien existing hereby in favor of the Pine Mountain Company for any of the purchase money hereof shall be subordinate to the paramount lien herein provided for the debenture bonds aforesaid." That is what was intended, and is what the deeds do say, by the warranties, and by the numerous provisions indicating that purpose. When Blake came into the scheme these contracts had already been executed so far that the bonds had been issued and distributed to the stockholders, and he entered with full knowledge of all the facts. The most favorable attitude for him would be that of a purchaser of the claims from the original vendors, as if they had taken the Minnesota lands directly in payment, and assigned the debts to him, in which case he could not claim subrogation, because his improvement company had assumed to pay them, and he was, in equity, on no higher ground in relation to the lien of the debenture bonds; he being, on the facts here, substantially the locum tenens of that company. But, by his contracts and the scheme employed, he was in a far less favorable attitude than this. The whole stupendous superstructure which has been constructed in this case, and by the argument of it for his relief, rests upon the defective foundation of an assumption that a vendor's lien, because it is a vendor's lien, is first in point of time, any and every where, as against any and every thing. Possibly this might be so, in the hands of an original vendor, and in the first instance; but the parties may contract about it, and often do, utterly destroying it, sometimes unwittingly perhaps, or, by providing for preferences over it, may replace it in any scale of liens which may be devised according to their will, and the holding of it by the equity of subrogation is always subject to any paramount equity which thus appears to have been set above it. This view of the case practically disposes of all the questions in it.

We have not adhered, as was done in the argument, to the distinction between the bill for rescission and the intervening petition, because either is defeated upon this consideration of the nonexistence of any vendor's lien paramount to the bonds, except in the hands of the original vendors to the Pine Mountain Company. All the complaints of nonperformance by the Pine Mountain Company, urged as reasons for rescission, are the same substantially as those set up as grounds for the relief asked by the intervening petition, which it is difficult to classify, unless it may be called an application for specific performance, which it is not. Frey, Spec. Perf. § 21 et seq. It prays that the Pine Mountain Company "shall pay to the holders thereof the said several lien claims, and other claims above mentioned, and assign and transfer the same to petitioner, and that the said several lien claims shall be adjudged in the hands of your peti-

tioner as having a lien prior and superior to that of the Louisville Trust Company, and that the lands covered by said liens, respectively, shall be sold for the payment of the amount due on account of said claims, so as to be assigned and transferred to your petitioner," and for general relief. It is called in one of the briefs "defenses and set-offs against the foreclosure" of the mortgage, and in another "the contention that about $100,000 of claims purchased, etc., should be assigned to him, foreclosed, and declared prior to the $500,000 mortgage, etc." And here again the fallacy of the whole contention appears in the use of the word "purchased." Blake did not buy these claims, but paid them. In the "suggestions as to the decree," concluding one of the briefs, it is suggested—First, that the foreclosure of the bond mortgage should be delayed; secondly, that the various defenses and set-offs should not only be applied to reducing the bonded debt to be foreclosed, but primarily to the payment of the installment of interest, for the forfeiture of which the declaration of maturity of the whole debt was made, wherefore we infer that it is contended that the right of foreclosure now would be thereby defeated; thirdly, that the wrongful conduct of the Pine Mountain Company in reference to the Appalachian lease should be held to have excused the payment of interest, and therefore the bonds have not been matured; and, lastly, that the improvement company should be given a reasonably time to make another lease, and "save its property from being absorbed by the Pine Mountain Company." Whatever these suggestions, and the pleadings on which they are based, may be technically denominated, under the rules of pleading, or as descriptive of the equitable nature of the relief sought, they are not those of specific performance; but, regardless of any considerations of technical defects, they all depend on an assumed priority of lien, which does not exist, and cannot be made available for all these formidable purposes. As we have before pointed out, Blake has so identified himself with the improvement company as its owner and paymaster, and his contracts are so interwoven and inseparably connected with those of the improvement company, that it is impossible for a court of equity to specifically perform any one, or on any one side, without decreeing specific performance of all of them on all sides, and the first thing to order in this direction, and on the suggested lines of decree, would be that the improvement company should perform its existing obligation to pay the purchase money, which would relieve all the rest. Its insolvency is a misfortune, no doubt, but there is no equitable reason in this record for imposing that misfortune on the Pine Mountain Company by the process suggested, instead of leaving it with Blake, who voluntarily assumed the risk of that misfortune. The claim of set-off stands on no better ground, and to call the proposed performance by that name does not render it any more available in a court of equity. If Blake had recovered a judgment at law for his damages for the alleged breaches of these contracts, and had execution with a nulla bona return, and the Pine Mountain Company had still the bonds in its exchequer, he might possibly reach them and their lien as assets of the company to pay its debts, but that relief is im-

possible here. If he could procure such a judgment, even through these proceedings in equity, and were entitled to it, when the fact is known that he never came into the enterprise until the bonds had been distributed to the stockholders, it would be an end of that relief, whether they are to be treated as innocent purchasers or not, for they are not parties to this litigation. He being a subsequent creditor, unless he can reach back and tie to the original creditors, —which he cannot do until at least their debts are paid by somebody, —we cannot see that he can complain of that distribution.

The complaint about the Appalachian lease is that the Pine Mountain Company would not consent that the improvement company should cut the timber for sale on the market to put it in funds to comply with its obligations under the lease to extend the railroad. The necessity for so raising money shows the desperate straits to which affairs had come, and the Pine Mountain Company might find justification for calling this a dangerous waste and impairment of security for the bonds. Whatever wrong there was, however, cannot be redressed in this proceeding. All we can rule about it is that it is not a ground for a rescission of the contract, nor a set-off, in the present attitude of the case.

Another cause of complaint in the case by Blake, in aid of his demand for rescission or set-off, is that the trust to the Germania Trust Company was not drawn according to the memorandum agreement for that trust contained in the Blake contract. We have already pointed out that this is not a ground for rescission. The decree of the circuit court has conformed the stipulations of the trust deed to the Blake contracts, and without that it is so obviously a right to have the trust administered according to the Blake contracts, as between the parties, that the trustee, in settling its accounts, would be compelled to conform its dealings to the Blake requirements without such correction, though it is well enough to make them. But this demand goes further, and it is denied that the trustee company had any right to advance money to the Pine Mountain Company to pay any debt Blake had not assumed to pay, or rather had not, by his contract, directed the trustee to pay out of the proceeds of the land; and this is undoubtedly true, and has been so, in effect, decided by the decree below, as we understand it. The further complaint under this head, that the trustee had no right to advance any money for any purpose, not even to pay what we may call the Blake claims, is not so clear, and we need not now decide it; for we are not, in this proceeding, taking any accounts of the trustee, or making any settlement between the parties, nor administering that trust, and what may or may not be credited by or charged to the trustee cannot be now determined. All we have before us is that this objection, whatever force there be in it, is not a ground of rescission or preference or set-off, as against the lien of the debenture bonds.

Finally we come to the question so much litigated and argued, arising out of the superimposed mortgage made by Blake after the Minneapolis lands were appraised, and before the final deed was made. We agree with the circuit court that Blake had no right,

under a proper construction of the contract of August 10, 1892, to place that mortgage on the property. The circuit court thought that the right of Blake to impose a mortgage within the limit of $20,000 was foreclosed by the appraisement, while the appellant Blake contends that, up to the final deed, he might properly place the mortgage. Much proof has been taken to show what the parties intended, upon the theory that, the language being ambiguous, it may be interpreted by the light of the facts. Either side simply testifies to its own construction, and if we should go into the proof it would be more difficult to determine where the intention lay, than to find it from the documents themselves. It is not an impossible inference from the proof—indeed, it may be probable—that Blake had it in his mind to do what he did do, but it is certain that that intention was not expressed in the contract, nor is it necessarily to be implied from it, and it is quite as certain that he never disclosed that intention or that desire to the Pine Mountain Company. On the other hand, it is altogether certain that the Pine Mountain Company did not understand that to be a right of Blake, and did not intend to contract that he should have what his counsel calls "an option" to do that thing. It was certainly contrary to the interest of the Pine Mountain Company to give Blake that privilege, and it will not be held to have done it without the words used bind it to that construction, or unless it is a necessary implication from within the four corners of the instrument. The parol proof may be looked to when an ambiguous expression is to be interpreted, but not to supply omissions, except where there are formal proceedings, and the jurisdiction to reform the words and phrases used, which must be done before construction takes place. There is a conclusive presumption that parties have put their whole agreement in writing, and previous negotiations are merged in it. Certainly any undefined, concealed, or unexpressed designs or intentions cannot be added by parol to words of a stipulation that import a consistent and sensible meaning within the scheme of the writing itself. Bailey v. Railroad Co., 17 Wall. 96, 105; Baker v. Nactrieb, 19 How. 126; Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213; De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536; Forsyth v. Kimball, 91 U. S. 291; Insurance Co. v. Mowry, 96 U. S. 544, 547; Seitz v. Machine Co., 141 U. S. 510, 12 Sup. Ct. 46; Clay v. Field, 138 U. S. 464, 11 Sup. Ct. 419; Manufacturing Co. v. Soxman, 138 U. S. 431, 11 Sup. Ct. 360; Bogk v. Gassert, 149 U. S. 17, 13 Sup. Ct. 738; Hazleton Tripod-Boiler Co. v. Citizens' St. Ry. Co., 72 Fed. 317, 323. Nor is there anything enlarging this authorized use of parol testimony in interpreting contracts to be inferred from the general expression used in Le Roy v. Beard, 8 How. 451, 466, or Goddard v. Foster, 17 Wall. 123, 142, about aiding the language employed by proof of the situation of the parties, the acts of the parties themselves, and "any other circumstances having a legal bearing and throwing light on the question," nor in its repetition in Runkle v. Burnham, 153 U. S. 216, 224, 14 Sup. Ct. 837. Neither of these cases is at all inconsistent with those we have cited from the supreme court of the United States. If the testimony here be admissible, it only confirms the in-

terpretation we give the contract apart from it, by showing conclusively that there was no agreement of the parties, mutually understood, that Blake should have a right or "option" to put mortgages on the land to be offered, so long as he did not exceed the limit. Their minds never consciously came together on that point, whatever might have been in either mind on that subject. Apart from all the testimony, the contracts are quite clear on the point. The ordinary rule is that contracts speak in præsenti, from the date of their execution, unless they themselves indicate some other time, which is only saying, however, that all men, in all things, using the language of the present, mean the present, unless the contrary appears. "We are all of opinion," said Baron Pollock, "that the deed must be taken to speak from the time of its execution. That is the plain interpretation of what was done by the parties. It is the same as if, on the day of the execution of the deed, a person had heard the defendant use the language contained in it." Jayne v. Hughes, 10 Exch. 430. 433. Thereby was saved to the plaintiff a bar of the statute of limitations. And so the habendum of a lease was not allowed to relate back to the date of the commencement of the tenancy in fact, so as to bring a destruction on the premises prior to its date within the protection of the covenants. Shaw v. Kay, 1 Exch. 412. Although the contract of August 10, 1892, is not a deed conveying lands in præsenti, and indeed is only an agreement to convey in futuro, and speaks of the conveyance to be made thereafter, it is a contract acting in the present in its obligation to do on either side the things to be done by each, and was intended to speak of the conditions then existing, and that which was to be done thereafter by either side was only to be done in future because it required time to complete the present performance. It did not specify the lands to be conveyed by Blake, on the one hand, nor the claims to be paid by the Pine Mountain Company, on the other, with any specific description, and only in a general way, because in the nature of the situation, as to each the description had to be general, and provision was made to insert the particulars, so to speak, when they could be described specifically. The lands were to be pointed out and appraised, the books to be examined for the claims to be paid. It might just as well be claimed that after August 10, 1891, the Pine Mountain Company could create new debts, which Blake must pay, to make up the $100,000 of assured liabilities, as to claim that Blake might create new incumbrances to make up that limit. The $100,-000 was the maximum limit, but, if the debts described should be less, Blake did not have to pay more. So the incumbrances were limited to one-half the fair market value, as per appraisement on any single tract, and the aggregate on all should "not exceed" $20,000, as the debts assumed were "not to exceed" $100,000, following the language of the original contract between the improvement company and the Pine Mountain Company. The present existence of the debts to be assigned is more specifically pointed out, it is true, because the words "now liable" are used in that connection, but none the less implied is the correlative obligation to convey the lands as then existing in respect of incumbrances. The contract provides, in its very

words, that the aggregate of incumbrances "existing" against said property shall not exceed $20,000, which word is quite as significant as the words "now liable," albeit not so absolutely certain in its significance, but only because of the omission of the word "now."

It was the opinion of the circuit court that Blake had power to create mortgages up to the appraisement, but not after. We think he had no power to create any after August 10, 1892. The whole instrument shows that it speaks of titles and incumbrances of that date. The parties were "to proceed at once to Minneapolis, Minn., and upon arrival there said second party is to furnish list and description of the real estate by lot, block, and subdivision. The property is to be pointed out, value determined, titles examined, and conveyances made by good and sufficient warranty deed as soon as practicable in the ordinary course of business." So it is throughout. The language implies present conditions, not future conditions; and provision is made for speedy removal of defective titles, or the immediate substitution of other property without defects. On the other hand, the obligations to be paid by the Iron Mountain Company are to be speedily ascertained. If less than the $100,000 "at the date of this agreement," a pro rata share of the real estate is to be reconveyed, and the debts are to be paid "within thirty days," or within that time from future maturity. Everything speaks of accomplished conditions to be immediately adjusted to this agreement, and there is no indication of changing the facts on which the conditions rest by the action of either party. In other words, the contract speaks in præsenti, and takes effect as if the parties had been heard to make the statements of that date; and all that is future is merely administrative, adjunctive, and auxiliary, and not creative. Much stress is laid on the words "shall not exceed," as relating to the incumbrance; the form indicating future action, and thereby creating this "option." But this is not a necessary implication as against all the rest of the document, and even grammatically the word "shall" may be used in the preterit present sense of "must," of which it is a synonym, and not always, or perhaps not most frequently, in the auxiliary future sense which is now urged here. Cent. Dict. The subsequent contract of October 25, 1892, does not change this feature of the other in any sense. Neither party had carried out the commands of the first, no matter for what cause, whether because of the dispute about this "option," and Blake's assumption to exercise it by creating a mortgage up to the limit, or otherwise, and this subsequent contract reserved that dispute for subsequent settlement by litigation. Therefore the question wholly depends on the construction of the document of August 10, 1892. We do not say that it might not have been a fair inference from the document itself, interpreted by the "light thrown upon the question" from the parol proof, that Blake could "point out" other lots or parcels than those he owned himself on the 10th day of August, 1892, nor that he might not, after that date, acquire property to be included; and possibly, when so acquired or used, if incumbrances existed at the date of acquisition the other side might have been compelled to take them, because of the general description of the thing sold,

and the elasticity of choice of lots to be offered for appraisement; but that would be an altogether different thing from that of Blake himself creating a mortgage on the whole offering subsequent to August 10, 1892, merely to reach the utmost limit allowed. So important a privilege as that should have been definitely expressed, and, not being so, cannot be implied.

What is to be the effect of this ruling of the circuit court, which we approve, when it comes to making a decree upon that fact,—that Blake violated the contract by placing the mortgage,—is a question of greater difficulty than the construction of the contract. Practically, it does not seriously involve the decree, since in this proceeding the trust of October 25, 1892, to the Germania Trust Company is not being administered at all. Technically, courts of equity, in exercising their power over trusts, may construe wills and deeds of trust, but generally not contracts in which there is no element of trust, such as the contract of August 10, 1892, is. Yet the parties seem in the contract of October 25, 1892, to have proceeded upon the theory that there was some such equitable remedy; for, in the reservation between them of this dispute from that settlement, Blake consents to enter his appearance "to such action" in the chancery court, subject to removal to the federal court. Of course, they could not confer the jurisdiction by contract or consent. Technically, again, perhaps the only remedy to settle the dispute was an action at law by the Pine Mountain Company against Blake for a breach of the contract. What would have been the measure of damages is not certain, until the developments of fact should show what had resulted in the way of damage. Obviously it could not be measured by the lump sum of the mortgage imposed, because the lands might be enough, notwithstanding, to pay the debts, and Blake be entitled to something back under the contract. Under the first of the two contracts there was a stipulation that, if the debts should turn out less than $100,000, Blake was to have lands reconveyed in proportion according to the appraisement, and while the Pine Mountain Company took them absolutely, and was to pay the outstanding debts speedily and absolutely, it was subject to this condition, and therefore the amount of the superimposed mortgage would not measure the damage. Nor would it under the second of the two contracts, when the Germania Company, as trustee, undertook to sell and apply the proceeds to the payment of the debts. Perhaps a court of law could have measured the damage by a process of valuation, and, if a court of equity should take charge of the dispute, it might have to find the same measure of damage. But that has not been done, and until it has been done the amount Blake is to pay has not been ascertained. The decree below directs "that J. D. Blake shall forthwith cause to be removed from the property embraced in the deeds executed by him to the Pine Mountain Iron & Coal Company, and referred to in said agreement of October 25, 1892, all incumbrances created by the mortgage of said Blake for $17,290, so that the said property shall stand free and released from any claim by reason of the execution of said mortgage by the said Blake. The said mort-

gage is the same that was executed by said Blake to the Metropolitan Trust Company of Minneapolis, Minn., dated 29th day of August, 1892." If Blake had been directed to bring the instrument into court to be canceled, or to execute some release or deed, or what not, perhaps the court could have compelled him thus "to remove" the mortgage, if it might proceed effectually to decree upon titles to land in another state, and in the absence of the mortgagee or those holding under him, but it does not do this. It, in effect, commands Blake to remove the mortgage by paying the mortgage debt. Undoubtedly the court had power to determine the point of litigation on the bill for rescission and the pleadings in that case, as an incident to the granting or denial of that relief, for the Pine Mountain Company pleads the wrongful mortgage as a defense to Blake's complaint of its nonperformance. We hold that he has no equity of rescission, whether the mortgage be rightful or wrongful; but if there had been grounds for it, and this wrongful mortgage did impede performance, as no doubt, in its natural effect, it would tend to do, if the property were close in its margins of value, it would be a defense to the bill, and the court might so declare. The cross bill of the Pine Mountain Company asks to have the contract of August 10, 1892, reformed by showing the true agreement in this respect; and, more than this, we think the point is within jurisdictional judgment upon Blake's intervening petition or cross bill asking to have the trust deed to the Germania Company reformed to comply with the stipulations of the contract between him and the Iron Mountain Company. In that contract this very dispute was reserved for adjudication in some form appropriate to a court of equity, and while, in the strictest technical sense, it is possible that the trust created by the deed of trust is disconnected with that dispute, and the trustee could proceed in administration without its settlement, still on the rescission bill we have hold of the question, and on the pleadings otherwise it is in litigation; so we think we need not remit the parties to a court of law, but may, in reforming the trust deed, note this stipulation, and give effect to it by directing a declaration in the trust deed that the imposition of the mortgage was unauthorized, and the trustee is directed, in any settlement of his accounts with Blake, to proceed on that basis of settlement, leaving the parties free to act as they may be advised to secure any further relief to which they may be entitled in that behalf. The decree of the circuit court will be affirmed, with costs to be paid by the appellant.